# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Salas*, 2011 IL App (1st) 091880

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SAMUEL SALAS, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-09-1880 |
| Filed | November 21, 2011 |
| Rehearing denied | January 4, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first-degree murder and his 50-year sentence for a gang-related shooting committed when he was 16 years old were upheld over his arguments that the automatic transfer provision of the Juvenile Court Act under which defendant was prosecuted in the criminal court was unconstitutional, that the trial court erred in refusing to give a second-degree murder instruction, that his trial counsel was ineffective, that he was deprived of his right to be present at the jury instruction conference, and that the State made improper comments in its closing arguments. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-21201; the Hon. Marcus R. Salone, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Michael J. Pelletier and Deborah Nall, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.

Children and Family Justice Center, Bluhm Legal Clinic, of Northwestern University School of Law, of Chicago (Cathryn S. Crawford and Shobha L. Mahadev, of counsel), and National Juvenile Defender Center, of Washington, D.C. (Nadia Seeratan, of counsel, and Samuel Golberg, law graduate), *amici curiae*.

Panel

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.

Justices Hall and Karnezis concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant, Samuel Salas, appeals his conviction of first-degree murder and his sentence of 50 years' imprisonment. Defendant contends: (1) the automatic transfer provision of the Juvenile Court Act of 1987 (automatic transfer statute) (705 ILCS 405/5-130 (West 2008)), pursuant to which defendant was transferred to adult court, violates the due process clauses of the federal and state constitutions, the eighth amendment of the federal constitution, and the proportionality clause of the Illinois Constitution; (2) the circuit court erred by refusing to give a second-degree murder instruction where the court instructed the jury on self-defense; (3) his trial counsel provided ineffective assistance; (4) defendant was deprived of his constitutional right to be present for the jury instruction conference; and (5) the State made improper remarks during closing arguments. We affirm.

¶ 2    The 16-year-old defendant was charged with the first-degree murder of the victim, Sergio Ojeda. Because of his age and the nature of his offense, defendant's case was automatically transferred to adult criminal court pursuant to the automatic transfer statute (705 ILCS 405/5-130 (West 2008)), which provides, in pertinent part, that 15- and 16-year-old defendants charged with first-degree murder are to be prosecuted under the Criminal Code of 1961 (720 ILCS 5/1-1 *et seq.* (West 2008)) and not the Juvenile Court Act of 1987.

¶ 3    Defendant's jury trial followed. At trial, 12-year-old Emmanuel Torres testified that in September 2007, he lived on the second floor of an apartment building at 4511 South

Spaulding Avenue in Chicago. Sergio lived in the same building and dated one of Emmanuel's sisters. After getting out of school at approximately 3:40 p.m. on September 11, 2007, Emmanuel played soccer with some friends in front of Berenice Lopez's house, which was down the street from Emmanuel's apartment building. Sergio was in an alley playing soccer with some of his friends. Emmanuel heard four or five gunshots, looked toward the alley, and saw Sergio trying to open a fence. Emmanuel saw a Hispanic guy in a white shirt and jeans with long, "puffy" hair shoot Sergio with a black gun from about two feet away. Sergio did not have a gun in his hands. Emmanuel did not see anyone other than the shooter and Sergio in the alley at that time. Emmanuel did not get a good look at the shooter's face.

¶ 4      Emmanuel testified he ran across the street to a friend's house. Emmanuel went inside the house and then peeked out a window. Emmanuel saw a group of "gangbangers," including three guys named Salvatore, Fernando, and Vince, beating the shooter. The gangbangers had been playing soccer with Sergio prior to the shooting.

¶ 5      Emmanuel testified he spoke to police after the shooting. Emmanuel told the police he saw a guy riding a bicycle and he saw a guy in a white shirt shoot Sergio four or five times. Emmanuel walked around the area with the police officer and pointed out where the shooting occurred. Emmanuel testified he did not remember telling the police officer and an assistant State's Attorney that he saw two guys walking on 45th Street, that he saw two guys walking who turned onto Spaulding Avenue, that he saw two guys riding bicycles, or that he saw two guys walking up the street yelling at other people.

¶ 6      Berenice Lopez testified that on September 11, 2007, she lived on the second floor of an apartment building at 4531 South Spaulding Avenue in Chicago with her parents and her two children. Sergio was her neighbor. Shortly before 6 p.m. on September 11, 2007, Berenice was outside her building, waiting for her mother-in-law to pick up her son. Berenice saw Sergio two houses away, walking toward an alley with Fernando, Salvatore, and Rego. After her mother-in-law picked up her son, Berenice tried to get back inside the apartment building, but the front door was locked. She began walking toward the back door, which was by the alley. Berenice saw Sergio in the alley, running toward 45th Street. She saw nothing in his hands. Defendant, who was wearing a white shirt and jeans, was running behind Sergio. Defendant had something black in his hand that he was holding out with an extended right arm. Berenice did not see anyone else in the alley. Sergio was trying to open the gate to the yard where Berenice lived. Berenice turned away and heard four or five gunshots. Berenice turned back around and saw defendant running toward 46th Street. Sergio was lying on the ground by the gate.

¶ 7      Berenice testified she went to Sergio and saw that he was bleeding from the head. She ran back to the front of her building and screamed for someone to call 911. Then she saw Fernando, Rodriguez and Vincent run over to defendant, who was three houses away from her, and they began beating him. Berenice ran over and told them to stop. Defendant grabbed Berenice and pulled her on top of him. As she tried to get up, Berenice saw a gun on the ground. Berenice testified the gun had to have come from defendant because it fell on her side and defendant was the only other person on the ground near her. Fernando picked up the gun with his shirt and began running toward 46th Street and Sawyer Avenue. The police arrived and defendant ran.

¶ 8        Berenice testified she went to the police station on the evening of September 11, 2007, and spoke with Detective Henry about the shooting. He showed her a photo array. Berenice identified a photograph of defendant as the person who shot Sergio. Berenice returned to the police station on October 3, 2007, and picked defendant out of a lineup as the person who shot Sergio.

¶ 9        Yvonne Nevarez, a Chicago public school teacher, testified that, on September 11, 2007, she was living at 4546 South Spaulding Avenue in Chicago. At approximately 6 p.m. on that date, she was in the alley packing up her father's truck when she heard a noise and saw defendant, who was wearing jean shorts and a white T-shirt, get off a bicycle and run toward her with a black gun in his hand. Defendant ran inside Yvonne's house, and she followed him inside. Yvonne's sons, ages 9 and 15, were also inside the house. Yvonne told defendant to get out of her house. Defendant said, "Save me." Then defendant ran out the front door with the gun still in his hand. Defendant crossed the street, where other teenage boys began beating him. Yvonne called 911.

¶ 10        Yvonne testified that later that evening, a detective came to her house and showed her a series of photographs. She identified a photograph of defendant as the person who ran into her house with a gun. On October 3, 2007, Yvonne went to the police station and picked defendant out of a lineup as the person who ran into her house with a gun.

¶ 11        Vincent Denova testified that on September 11, 2007, he lived at 4637 South Spaulding Avenue in Chicago and was a member of the SD gang, also known as the Satan Disciples. The 4600 block of South Spaulding Avenue was Satan Disciple territory. Vincent admitted he lied when he told the police and the grand jury that he was not a Satan Disciple.

¶ 12        Vincent testified that at approximately 6 p.m. on September 11, 2007, he was in the alley between Spaulding and Sawyer Avenues playing soccer with Sergio, Fernando Diaz, Salvatore Diaz, another boy named Fernando, and Rego. Vincent identified Fernando Diaz and Salvatore Diaz as Satan Disciples, but stated that the other Fernando, Rego, and Sergio were not Satan Disciples. They stopped playing when the ball went over the gate. They went to the front of a nearby house and started talking and drinking beer. Rego stated he needed his ball back. Sergio went through the gangway toward the alley to retrieve the ball. Vincent followed him from a couple of feet away. When Sergio reached the alley, he turned to the left and began running. Vincent then saw a light-skinned, Hispanic male, wearing a white shirt and holding a gun, start shooting. Vincent could not see the shooter's face. Vincent heard four or five gunshots and then ran and hid between a couple of nearby buildings.

¶ 13        Vincent testified that, after the shooting stopped, he heard Berenice screaming that Sergio had been shot. Vincent came out of hiding and saw that Sergio was lying facedown on the ground with his hand holding onto the gate that surrounded Berenice's backyard. Vincent heard Salvatore and Berenice say, "He's right there." People were pointing at a guy in a white shirt who was standing between Vincent and Salvatore.

¶ 14        Vincent testified he, Fernando Diaz, the other Fernando, and Salvatore began beating the guy in the white shirt, who fell to the ground. Vincent kicked him and hit him with a brick. Vincent saw a gun fall from the guy's waist. Berenice ran over and tried to stop them from beating him. The guy grabbed Berenice and pulled her down on top of him. Vincent kicked

him in the face and he let Berenice go. The police arrived and the guy got up and ran away.

¶ 15 Vincent testified that police officers showed him some photographs on September 11, 2007, and asked him if he could identify the guy in the white shirt who had been holding the gun. Vincent was unable to identify anyone.

¶ 16 Fernando Diaz testified that, in September 2007, he lived at 5026 South Spaulding Avenue and was a member of the Satan Disciples gang. At approximately 6 p.m. on September 11, 2007, he was in the alley between Sawyer and Spaulding Avenues and 45th and 46th Streets playing soccer and drinking beer with Sergio, Salvatore, Vincent, Fernando Rodriguez, and Rego. After they stopped playing, they went "to the front" and were "just sitting around." At some point, Sergio began walking back toward the alley. Fernando Diaz and Salvatore followed from behind.

¶ 17 Diaz testified that, at the alley, he saw defendant get off a bicycle, pull out a gun, and begin running. Defendant was wearing a white shirt. Diaz heard five or six gunshots but did not see the actual shooting. When the shots rang out, Diaz ran and hid. After the shooting stopped, Diaz and Salvatore went back to the alley and saw defendant holding a gun. Defendant pointed the gun at Diaz and tried to fire it twice, but it just clicked because it was out of bullets. Diaz and Salvatore chased defendant, who ran into a nearby house. Diaz lost sight of him, but he later saw him at 46th Street and Spaulding Avenue. Diaz grabbed a rock and went after him. Fernando Rodriguez knocked defendant down and hit him with a brick. Diaz and Vincent began hitting defendant, and Diaz also kicked him in the body. Berenice ran over and told them to stop.

¶ 18 Diaz testified that the gun fell during the altercation. Diaz grabbed the gun and began running. Police stopped him at 46th Street and Sawyer Avenue.

¶ 19 Officer Ronald Reed testified he was working in uniform in a marked car with his partner, Officer Lorenz, on September 11, 2007, when he was assigned to the 4500 block of South Spaulding Avenue. When they arrived on the block, they saw people pointing at a guy in a white shirt and saying, "He shot my guy." Officer Reed made an in-court identification of defendant as the guy in the white shirt.

¶ 20 Officer Reed testified he exited his patrol car and saw defendant standing on the sidewalk, bleeding from his head. When defendant saw the officer, he began to run away, eastbound, through the gangway. Officer Reed and Officer Lorenz chased after defendant and eventually apprehended him. Defendant did not have any weapons on him.

¶ 21 Officer Reed testified that, after they apprehended defendant, a couple of Drug Enforcement Administration (DEA) agents at the end of the alley yelled, "We have another one down here." Officer Reed walked over and saw they had detained Fernando Diaz. There was a black gun on the ground near Diaz. Officer Reed placed Diaz in custody and secured the gun.

¶ 22 Officer Reed testified regarding the tattoos defendant had when he was arrested. Defendant had three dots on his right middle finger. The three dots indicated defendant was a member of a gang that was part of the Folk Nation. Folk Nation gangs are rivals of the Satan Disciples.

¶ 23 Officer Paul Lorenz testified consistently with Officer Reed regarding their apprehension

of defendant. Officer Lorenz further testified that, following defendant's arrest, the officer located Sergio, who was lying on the ground with a gunshot wound to the back of his head. Officer Lorenz called for an ambulance and spoke with Berenice. Berenice told him she saw a male Hispanic in a white T-shirt come up to Sergio and shoot him once in the head. Officer Lorenz testified that Berenice identified defendant as the person in the white T-shirt who had shot Sergio.

¶ 24    Keith Landa, a special agent with the DEA, testified that at approximately 6 p.m. on September 11, 2007, he was in the area of the 4500 block of South Sawyer Avenue with some other DEA agents, conducting surveillance of a drug-trafficking organization. Agent Landa heard several gunshots and saw Fernando Diaz run away, with a gun near his waistband. Agent Landa and his fellow agents drew their guns, identified themselves, and ordered Diaz to the ground. He complied. Agent Landa turned Diaz and the gun over to Officer Reed.

¶ 25    Detective John Henry testified he was working with his partner, Detective Holmes, on September 11, 2007, when they received an assignment shortly after 6 p.m. to investigate Sergio's shooting death. They went to the alley at 4531 South Spaulding Avenue, where they observed Sergio's body lying on his back, covered in a white sheet. Detective Henry returned to the police station, where he spoke with Berenice and showed her a photo array. Berenice identified a photograph of defendant as the person she saw chasing Sergio with a gun. On October 3, 2007, Detective Henry met again with Berenice at the police station, where she viewed a lineup and identified defendant as the person she saw chasing Sergio with a gun and whom she saw fleeing southbound through the alley after the shots were fired.

¶ 26    Detective Patrick McCormack testified he received an assignment on September 11, 2007, to investigate Sergio's shooting death. Detective McCormack went to the 4500 block of South Spaulding and spoke with Yvonne Nevarez. Detective McCormack showed Yvonne a photo array, from which she identified a photograph of defendant as the person who ran into her house with a gun.

¶ 27    Detective Henry testified that on October 3, 2007, Yvonne identified defendant in a lineup as the person who ran into her house with a gun.

¶ 28    The parties stipulated that Jill Counts would testify she was a forensic investigator with the Chicago police department. At approximately 6:45 p.m. on September 11, 2007, she went to the area of 4531 South Spaulding Avenue to investigate Sergio's shooting death. She recovered one spent cartridge case from the rear gangway at 4531 South Spaulding Avenue, five spent cartridge cases from the alley at 4536 South Sawyer Avenue and two bricks from 4551 South Spaulding Avenue.

¶ 29    The parties stipulated that Sheila Daugherty, a forensic scientist with the Illinois State Police Division of Forensic Services and a qualified expert in the field of fingerprint analysis and fingerprint identification, would testify she received six fired cartridge cases, one gun and one ammunition magazine in connection with Sergio's homicide. None of those items contained latent impressions suitable for comparison.

¶ 30    The parties stipulated that Aaron Horn, a forensic scientist with the Illinois State Police and a qualified expert witness in the field of firearms identification, would testify he received

six fired cartridge cases, a gun and magazine, two fired bullets and one lead fragment in connection with the investigation of Sergio's homicide. Horn tested the items and determined that the two fired bullets and six discharged cartridge cases were all fired from the gun he received, and that the two bullets could have been one bullet that split after striking bones in a human head.

¶ 31    The parties stipulated that forensic investigator Eugene Chudy would testify that at approximately 8:25 p.m. on September 11, 2007, he went to Mt. Sinai Hospital to administer a gunshot-residue collection kit and recover clothing. He photographed defendant in the emergency room and collected gunshot-residue samples from defendant's hands and forehead.

¶ 32    Scott Rochowicz testified he was a forensic scientist with the Illinois State Police who specialized in microscopy and trace evidence. Defendant stipulated that Rochowicz was an expert in the field of gunshot residue. Rochowicz testified he analyzed the gunshot-residue kit collected from defendant. He explained that gunshot residue contains antimony, barium and lead. A particle containing two of these three elements is referred to as a consistent particle, whereas a particle containing all three of these elements is referred to as a unique particle. A unique particle only originates from the discharge of a firearm. Tests on the swabs from defendant's forehead and hands did not reveal any unique particles. Rochowicz concluded that the absence of any unique particles indicated defendant "may not have discharged a firearm."

¶ 33    Rochowicz further testified that not everyone who fires a gun will have gunshot residue on his or her hands. A defendant could engage in various activities that would remove gunshot residue, such as: rubbing his hands together or on his pants; putting his hands in his pockets; washing his hands; running; holding the handlebars of a bicycle; opening a door; engaging in a fistfight; getting blood on his hands; having his hands come into contact with his clothes when he is handcuffed behind his back; or touching the sheets in the ambulance or hospital bed.

¶ 34    Doctor Michel Humilier, an assistant medical examiner in the Cook County medical examiner's office, testified he performed the autopsy on Sergio. His external examination revealed a gunshot wound on the back of the right side of the head, behind the ear, that had a ring of abrasion around the wound. Doctor Humilier concluded that Sergio died of a gunshot wound to the head and the manner of his death was homicide.

¶ 35    Detective McCormack, who previously testified for the State, was called to testify for the defense. Detective McCormack testified he interviewed Emmanuel Torres twice on September 11, 2007, and again on September 12, 2007. Emmanuel initially stated he saw a group of Hispanic males on bicycles. Emmanuel subsequently stated that, sometime before the shooting, he saw two guys walk westbound on 45th Street. Two other guys rode up on a bicycle east on 45th Street to Spaulding Avenue. Emmanuel stated that the two guys who were walking were yelling something, but he could not make out what they were yelling about. Detective McCormack showed Emmanuel a photo array on September 12, 2007. Emmanuel tentatively identified defendant as the shooter, but stated the photograph of defendant showed him with hair shorter than it was at the time of the shooting. Emmanuel

also stated that, if he "used the hair" from another person in the photo array and used the facial hair from a third person in the photo array, "that would look more like the person that was the shooter."

¶ 36 Detective Henry, who previously testified for the State, was called to testify for the defense. Detective Henry testified he and his partner interviewed Fernando Diaz in connection with the homicide, and Diaz told them the guy in the white shirt had pointed a weapon at him and that he had heard the gun "click" but not fire. Detective Henry did not include this information in his reports. Detective Henry also testified that he was with Emmanuel Torres when Emmanuel viewed a physical lineup on October 3, 2007. Emmanuel did not identify anyone in the lineup.

¶ 37 Defendant testified on his own behalf that he was 16 years old on September 11, 2007, and lived with his mother and sister at 33rd and Aberdeen Streets. Defendant was a member of the Two-Six street gang and has a tattoo of three dots on his right middle finger indicating his membership in the gang. When school let out that day at 2:30 p.m., defendant went to his friend Anthony Grasso's house at 45th Street and Kedzie Avenue to play video games. Defendant left Anthony's house at approximately 5 p.m. and borrowed Anthony's bicycle to ride to a Subway restaurant at 47th Street and Kedzie Avenue. After eating at Subway, defendant decided to visit a girl he knew who lived near Spaulding and Sawyer Avenues. Defendant began riding his bicycle on Spaulding Avenue and saw a group of boys he did not know on Spaulding Avenue near 46th Street. Defendant turned right on 46th Street in order to avoid those boys and then turned left into an alley between Spaulding and Sawyer Avenues.

¶ 38 Defendant testified that as he rode down the alley, he saw a Hispanic male come out of a gangway on the left side and flash a gang sign toward defendant. Defendant testified he recognized that gang sign as indicating that the person flashing it belonged to the Satan Disciples. Defendant explained that he became afraid because he knew that the Satan Disciples were rivals of the Two-Six gang to which he belonged.

¶ 39 Defendant testified he could have turned around and avoided any confrontation. Instead, he continued to ride the bicycle in the direction of the person flashing the Satan Disciples gang sign. When defendant was within approximately four feet of him, the person pulled a gun from his right pocket and tried to point it at defendant. Defendant jumped off the bicycle and grabbed the person's arm. They struggled, and the person fired the gun without hitting defendant. The person eventually tired during the struggle and dropped the gun. Defendant picked up the gun and ran to the bicycle. Defendant testified he never touched the trigger, he never shot the gun while he was in the alley and he did not shoot anyone.

¶ 40 Defendant testified he rode the bicycle as fast as he could out of the alley toward 46th Street. Defendant thought there was a third person in the alley because as he rode toward 46th Street, he heard gunshots and felt "heat flying past [his] head." When defendant reached the end of the alley, he turned right onto 46th Street and went across Spaulding Avenue toward an alley, where his bicycle chain broke. Defendant jumped off the bicycle and saw "a whole group of guys" were chasing him. Defendant ran into the alley. Defendant still had the gun on him.

¶ 41    Defendant testified that, in the alley, he saw an open door to a house near a van from which people were unloading building materials. Defendant ran inside the house and screamed for help. The people inside the house screamed at him to get out. He ran out the front door, through the yard, back onto Spaulding Avenue, where he again encountered the group who had been chasing him. Defendant turned around and attempted to run into a gangway, but he slipped and fell to the ground. The group caught up to him and began punching and kicking him and hitting him with bricks. Defendant put his hands over his head and his knees to his chest and balled up on the ground. At some point during the beating, the gun he was holding fell to the ground.

¶ 42    Defendant testified that the beating slowed down when two women, one older and one younger, screamed for them to stop punching and kicking him. Defendant reached up and pulled the younger woman on top of him in an effort to protect himself from the group. The group pulled her up and stopped beating him long enough for him to get up and run away.

¶ 43    Defendant testified he ran through the gangway, across the alley, and into a yard, where police officers caught him. Defendant testified he was treated at Mt. Sinai Hospital for the injuries he received from the beating. At the hospital, a detective asked defendant questions. However, defendant testified he did not remember most of the questions that were asked of him or the answers that he gave. Defendant testified he remembered only that he told the detective that he fought with someone and got control of the gun. He did not remember telling the detective that he fired the gun three times. Defendant remembered telling the detective that the gun fell to the ground, after which he ran away.

¶ 44    During cross-examination, defendant showed the jury what the Two-Six gang sign would look like. The prosecutor stated for the record that defendant "has his first two finger[s] up in a V and bottom two finger[s] curved to his thumb to make what [she] would refer to as the bunny."

¶ 45    Detective Michael O'Donnell testified for the State in rebuttal that, just after 6 p.m. on September 11, 2007, he and Detective James Butler went to Mt. Sinai Hospital and arrived there at about 6:42 p.m. Detective O'Donnell spoke with defendant in the emergency room. Defendant told him his name, date of birth, home address, his mother's name and her phone number. Detective O'Donnell called defendant's mother and had a brief conversation with her. After that conversation, Detective O'Donnell returned to defendant's room and spoke with him again. At that point, Detective O'Donnell did not know if defendant was the offender or a victim, so he gave *Miranda* warnings "to cover [his] bases." They had a brief conversation, during which defendant denied having a gun and denied being involved in an altercation.

¶ 46    Detective O'Donnell testified that after this brief conversation, he left the emergency room, contacted personnel at the scene of the crime, and had a discussion with them. A short time later, he returned to the emergency room and again spoke with defendant. Detective O'Donnell told defendant he was under arrest and asked if he still wished to talk. Defendant responded affirmatively. Defendant told Detective O'Donnell he had been riding his bicycle down Sawyer Avenue, when a person nicknamed AKD, whom he knew from high school, came out of the gangway, said "What's up," and pulled out a black, semiautomatic handgun.

AKD fired a shot at defendant. Defendant struggled with AKD and gained "partial control over the weapon." Defendant pulled the trigger three times. The struggle continued, and at some point the gun was knocked to the ground and defendant started to run away. Defendant told Detective O'Donnell that AKD then shot him in the head. Detective O'Donnell subsequently spoke with defendant's doctor about his injuries. The doctor said defendant did not have a gunshot wound but that he had lateral fractures to the skull indicative of blunt force trauma.

¶ 47   During the jury instruction conference, defense counsel tendered an instruction on self-defense. The State objected, noting defendant's testimony that he never pulled the trigger of the gun or otherwise caused Sergio's death. The State argued that a self-defense instruction is not applicable to a killing which defendant denied committing. Defense counsel responded that, even though defendant denied shooting Sergio, the jury could nonetheless find from the evidence that Sergio was shot while he struggled with defendant for control of the gun. Defense counsel argued that, under that scenario, defendant was entitled to an instruction on self-defense. The circuit court gave the self-defense instruction over the State's objection.

¶ 48   Defendant also tendered an instruction on second-degree murder based on an unreasonable belief in self-defense. The State objected, noting that in the absence of any evidence of self-defense, the second-degree murder instruction should not be given. The State also argued that, even if the evidence supported the self-defense instruction, there was no evidence his belief in self-defense was unreasonable. The circuit court denied the instruction on second-degree murder.

¶ 49   The jury convicted defendant of first-degree murder and found that, during the commission of the offense, defendant personally discharged a firearm that proximately caused the victim's death.

¶ 50   The cause proceeded to sentencing. The *maximum* sentence for a juvenile tried for murder in juvenile court is commitment to the Department of Juvenile Justice until he turns 21 (705 ILCS 405/5-750(2) (West 2008)), whereas the *minimum* sentence for a juvenile tried in adult criminal court is 20 years in prison (730 ILCS 5/5-4.5-20 (West 2008)). In the present case, because of the confluence of the automatic transfer statute (705 ILCS 405/5-130 (West 2008)), the firearm enhancement statute (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008)), and the abolition of early release for first-degree murder (730 ILCS 5/3-6-3(a)(2)(i) (West 2008)), defendant's automatic transfer to adult criminal court subjected him to a minimum of 45 years in prison upon his conviction. After considering the evidence in aggravation and mitigation, the circuit court sentenced defendant to 25 years' imprisonment on the murder conviction and an additional, consecutive 25 years' imprisonment for personally discharging the firearm that proximately resulted in the victim's death. Defendant's motion to reduce the sentence was denied.

¶ 51   Defendant now appeals. The Children and Family Justice Center and the National Juvenile Defender Center filed a brief as *amici curiae* in support of defendant. The *amici* brief largely mirrors defendant's constitutional arguments.

¶ 52   First, defendant argues that the automatic transfer statute, whereby he was transferred to adult criminal court without a hearing or any consideration of his youth or culpability or

amenability to rehabilitation and subjected to a minimum 45-year prison term, constituted a cruel and unusual punishment in violation of the eighth amendment.

¶ 53    A statute carries a strong presumption of constitutionality. *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). The party challenging the statute bears the burden of clearly establishing that it violates the constitution. *Id.* at 487. A reviewing court has "a duty to construe a statute in a manner that upholds its validity and constitutionality if it reasonably can be done." *People v. Graves*, 207 Ill. 2d 478, 482 (2003). The constitutionality of a statute is a matter of law subject to *de novo* review. *Sharpe*, 216 Ill. 2d at 486-87.

¶ 54    In support of his constitutional arguments, defendant cites *Roper v. Simmons*, 543 U.S. 551 (2005), and *Graham v. Florida*, 560 U.S. ___, 130 S. Ct. 2011 (2010). In *Roper*, the respondent, Christopher Simmons, committed murder in Missouri. As he was 17 years old at the time of the crime, he was outside the criminal jurisdiction of Missouri's juvenile court system. *Roper*, 543 U.S. at 557. Respondent was tried as an adult, convicted, and sentenced to death. *Id.* at 557. Respondent filed a petition for postconviction relief, arguing that the Constitution prohibits the execution of a juvenile who was under the age of 18 when the crime was committed. *Id.* at 559. The Missouri Supreme Court agreed that the eighth amendment prohibited the execution of a juvenile under the age of 18 when the crime was committed, and so the court set aside respondent's death sentence and resentenced him to life imprisonment. *Id.* at 559-60.

¶ 55    The United States Supreme Court granted *certiorari* and began its analysis by noting that under the eighth amendment, the punishment for a crime should be proportional to the offense. *Id.* at 560. In determining whether respondent's death penalty violated the eighth amendment, the Supreme Court held that it must consider " 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." *Id.* at 560-61 (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) (plurality op.)). The beginning point of the analysis is "a review of objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question. *** We then must determine, in the exercise of our own independent judgment, whether the death penalty is a disproportionate punishment for juveniles." *Id.* at 564.

¶ 56    The Supreme Court determined that the objective indicia indicated that the national consensus was against the death penalty for juveniles, as evidenced by the fact that 30 states prohibited the juvenile death penalty, in the other 20 states the practice was infrequent, and the consistent trend was toward abolition of the practice. *Id.* at 564-67.

¶ 57    Having determined that the national consensus was against the juvenile death penalty, the Supreme Court next considered whether the juvenile death penalty was a disproportionate punishment for juveniles. The Supreme Court noted that capital punishment must be limited to offenders whose "extreme culpability makes them 'the most deserving of execution' " (*id.* at 568 (quoting *Atkins v. Virginia*, 536 U.S. 304, 319 (2002)), but "[t]hree general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders" (*id.* at 569). First, the Supreme Court noted scientific and sociological studies which indicate that juveniles under 18 possess a lack

of maturity and an underdeveloped sense of responsibility as compared to adults. *Id.* Second, juveniles are more susceptible to negative influences and outside pressures than are adults. *Id.* Third, the juvenile's character is not as well formed as that of an adult. *Id.* at 570. The Supreme Court held "[t]hese differences render suspect any conclusion that a juvenile falls among the worst offenders" (*id.*) and "[o]nce the diminished culpability of juveniles is recognized, it is evident that the penological justifications for the death penalty apply to them with lesser force than to adults" (*id.* at 571). Specifically, the Supreme Court noted that the two primary penological justifications for the death penalty are retribution and deterrence. *Id.* The Court held:

> "Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity.
>
> As for deterrence, it is unclear whether the death penalty has a significant or even measurable deterrent effect on juveniles ***." *Id.*

¶ 58    The Supreme Court concluded that the eighth amendment forbids imposition of the death penalty on offenders who were under the age of 18 when they committed their crimes. *Id.* at 578.

¶ 59    In *Graham*, petitioner Terrance Jamar Graham was 16 years old when he attempted to rob a restaurant in Florida. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2018. He was charged as an adult and pleaded guilty to armed burglary with assault or battery, and attempted armed robbery. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2018. Petitioner was sentenced to concurrent three-year terms of probation. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2018. The trial court subsequently determined that petitioner had violated his probation by committing a home-invasion robbery, by possessing a firearm, by associating with persons engaged in criminal activity, and by attempting to avoid arrest. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2019. The Court then sentenced petitioner to the maximum sentences for the earlier armed burglary and attempted armed robbery charges: life imprisonment for the armed burglary and 15 years for the attempted armed robbery. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2020. Petitioner filed a motion challenging his sentence under the eighth amendment. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2020. The trial court denied the motion and the court of appeals affirmed. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2020. The United States Supreme Court granted *certiorari* and framed the issue as "whether the Constitution permits a juvenile offender to be sentenced to life in prison without parole for a nonhomicide crime." *Graham*, 560 U.S. at ___, 130 S. Ct. at 2017-18.

¶ 60    Applying the analysis utilized in *Roper*, the Supreme Court began by examining legislative enactments to determine whether a national consensus existed against imprisoning juveniles to natural life in prison without parole for a nonhomicide crime. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2023. The Supreme Court noted that while 37 states and the District of Colombia permit such sentences, actual sentencing practices indicate they are imposed most infrequently; only 11 jurisdictions nationwide impose life without parole sentences on juvenile nonhomicide offenders, while 26 states, the District of Colombia, and the federal government do not impose them. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2023-24. The

Supreme Court determined that as the sentencing practice was exceedingly rare, " 'it is fair to say that a national consensus has developed against it.'" *Graham*, 560 U.S. at ___, 130 S. Ct. at 2026 (quoting *Atkins*, 536 U.S. at 316.)

¶ 61    The Supreme Court next determined that while community consensus is entitled to great weight, the Court must still exercise its independent judgment to determine whether the eighth amendment prohibits imprisoning juveniles to natural life without parole for a nonhomicide crime. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2026. Such independent judgment requires consideration of the culpability of the offenders, the severity of the punishment, and the legitimate penological goals served by the challenged sentencing practice. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2026. The Supreme Court noted its holding in *Roper* that juveniles have lessened culpability because of their lack of maturity and underdeveloped sense of responsibility, their susceptibility to outside pressures, and their characters, which are not as well formed as that of an adult. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2026. Also, recent scientific data confirm that juveniles have lessened culpability than adults due to differences in brain development. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2026. The Supreme Court further noted that juveniles who do not kill, intend to kill, or foresee that death will result from their actions are "categorically less deserving of the most serious forms of punishment than are murderers." *Graham*, 560 U.S. at ___, 130 S. Ct. at 2027.

¶ 62    As for the punishment, the Supreme Court noted that life imprisonment without parole is the second most severe penalty under the law and is an especially harsh punishment for a juvenile, who will on average serve more years and a greater percentage of his life in prison than an adult defendant. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2027-28.

¶ 63    Finally, the Supreme Court determined that none of the legitimate penological goals–retribution, deterrence, incapacitation, and rehabilitation–provides an adequate justification for sentencing a juvenile to natural life imprisonment without parole for a nonhomicide crime. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2028-30. With respect to retribution, the Court noted " 'the case for retribution is not as strong with a minor as with an adult' " (*Graham*, 560 U.S. at ___, 130 S. Ct. at 2028 (quoting *Roper*, 543 U.S. at 571)) and that the case "becomes even weaker with respect to a juvenile who did not commit homicide" (*Graham*, 560 U.S. at ___, 130 S. Ct. at 2028). With respect to deterrence, the Court noted: "in light of juvenile nonhomicide offenders' diminished moral responsibility, any limited deterrent effect provided by life without parole is not enough to justify the sentence." *Graham*, 560 U.S. at ___, 130 S. Ct. at 2029. With respect to incapacitation, the Court noted: "[t]o justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible. The characteristics of juveniles make that judgment questionable." *Graham*, 560 U.S. at ___, 130 S. Ct. at 2029. With respect to rehabilitation, the Court noted that a sentence of life imprisonment without parole "is not appropriate in light of a juvenile nonhomicide offender's capacity for change and limited moral culpability." *Graham*, 560 U.S. at ___, 130 S. Ct. at 2030.

¶ 64    The Supreme Court concluded: "for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole." *Graham*, 560 U.S. at

-13-

___, 130 S. Ct. at 2030.

¶ 65    Defendant argues that the automatic transfer statute at issue here is inconsistent with the Supreme Court's reasoning in *Roper* and *Graham* that all children under the age of 18 are less culpable and more amenable to rehabilitation than adults. Defendant contends, pursuant to *Roper* and *Graham*, the automatic transfer statute violates the eighth amendment by mandating that all 15- and 16-year-old defendants who have been charged with certain predicate offenses, including first-degree murder, must be transferred to adult court without consideration of their youthfulness or culpability.

¶ 66    Defendant's contention is without merit. The eighth amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual *punishments* inflicted." (Emphasis added.) U.S. Const., amend. VIII. The statutes at issue in *Roper* and *Graham* imposed the death penalty (*Roper*) and natural life in prison without parole (*Graham*) on juveniles and clearly constituted punishments that were subject to constitutional analysis under the eighth amendment. By contrast, the automatic transfer statute at issue here does not impose any punishment on the juvenile defendant, but rather it only provides a mechanism for determining where defendant's case is to be tried, *i.e.*, it provides for the forum in which his guilt may be adjudicated. The punishment imposed on defendant here, specifically, his 50-year sentence of imprisonment, was made pursuant to the Unified Code of Corrections and not pursuant to the automatic transfer statute. As the automatic transfer statute does not impose any punishment, it is not subject to the eighth amendment.

¶ 67    The holding in *Roper* was that the eighth amendment forbids imposition of the death penalty on offenders who were under the age of 18 when they committed their crimes; the holding in *Graham* was that the eighth amendment forbids imposition of natural life imprisonment without parole on juvenile offenders who did not commit homicide. Neither *Roper* nor *Graham* addressed the constitutionality of an automatic transfer statute similar to the one at issue here. The eighth amendment principles and analysis utilized in *Roper* and *Graham* have no application where the statute at issue imposes no punishment and is not subject to the eighth amendment.

¶ 68    Even if we were to apply the *Roper* and *Graham* analysis here, our result would be the same. The starting point of the analysis is to consider legislative enactments to determine whether a national consensus exists against automatic transfer statutes. *Roper*, 543 U.S. at 564; *Graham*, 560 U.S. at ___, 130 S. Ct. at 2023. Defendant cites no legislative enactments indicating that such a national consensus against automatic transfer statutes exists. The second part of the analysis requires us to independently determine whether the eighth amendment prohibits the automatic transfer of 15- and 16-year-old defendants who have been charged with first-degree murder. *Roper*, 543 U.S. at 564; *Graham*, 560 U.S. at ___, 130 S. Ct. at 2026. This determination requires us to consider defendant's culpability, the severity of the punishment imposed by the automatic transfer statute, and the legitimate penological goals served by that statute. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2026. As discussed above, the Supreme Court determined from recent sociological and scientific studies that juveniles have lessened culpability than adults and are less deserving of the most severe punishments, such as the death penalty in a homicide case or natural life in prison in

-14-

a nonhomicide case. *Roper*, 543 U.S. at 569-71; *Graham*, 560 U.S. at ___,130 S. Ct. at 2026. Accordingly, the Supreme Court held that such punishments violate the eighth amendment. *Roper*, 543 U.S. at 578; *Graham*, 560 U.S. at ___, 130 S. Ct. at 2034. However, the automatic transfer statute does not itself impose any punishment on defendant, but merely provides the forum where his guilt will be adjudicated. In the absence of any punishment imposed by the automatic transfer statute, the eighth amendment has no application here regardless of defendant's lessened culpability. Accordingly, even under the *Roper* and *Graham* analysis, we would affirm defendant's conviction.

¶ 69 Defendant also argues that the automatic transfer statute violates the proportionate penalties clause. The proportionate penalties clause of the Illinois Constitution states: "[a]ll *penalties* shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Emphasis added.) Ill. Const. 1970, art. I, § 11. Our supreme court has identified two distinct tests to evaluate a proportionality challenge. First, "a penalty violates the proportionate penalties clause if it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community." *People v. Moss*, 206 Ill. 2d 503, 522 (2003). Second, "the proportionate penalties clause is violated where offenses with identical elements are given different sentences." *Moss*, 206 Ill. 2d at 522. Our supreme court recently abandoned a third method, the "cross-comparison analysis," because it had proven to be "problematic and unworkable." *People v. Sharpe*, 216 Ill. 2d 481, 519 (2005).

¶ 70 Our analysis of defendant's eighth amendment challenge also applies to his proportionate penalties challenge. The Illinois Supreme Court has held: the "proportionate penalties clause is coextensive with the cruel and unusual punishment clause. [Citation.] Both clauses apply only to the criminal process–that is, to direct actions by the government *to inflict punishment*." (Emphasis added.) *In re Rodney H.*, 223 Ill. 2d 510, 518 (2006). The automatic transfer statute imposes no penalty or punishment and so neither the proportionate penalty clause nor the *Roper* and *Graham* analysis applies here.

¶ 71 Defendant contends *People v. Miller*, 202 Ill. 2d 328 (2002), compels a holding that the automatic transfer statute as applied to him violates the proportionate penalties clause. In *Miller*, the 15-year-old defendant was convicted of two counts of first-degree murder based on accountability when he acted as a lookout. *Id.* at 330-31. The circuit court refused to impose the statutorily mandated sentence of natural life imprisonment under the multiple-murder provision of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996)), finding that application of the statute to Miller would violate the proportionate penalties clause. *Miller*, 202 Ill. 2d at 330. The circuit court instead sentenced him to 50 years in prison. *Id.*

¶ 72 On appeal, the supreme court noted that a sentence of natural life imprisonment would be the result of three converging statutes: (1) the automatic transfer statute, which "mandates that all 15- or 16-year-old offenders charged with murder be automatically transferred and prosecuted as adults in criminal court"; (2) the accountability statute (720 ILCS 5/5-2(c) (West 1996)), which "effectively bars courts from considering the offender's degree of participation in the crime by making all persons who participate in a common criminal design equally responsible;" and (3) the multiple-murder sentencing statute (730 ILCS 5/5-8-

-15-

1(a)(1)(c)(ii) (West 1996)), which "does not allow a court to consider the age of the offender or the offender's participation in the crime at the time of sentencing." *Miller*, 202 Ill. 2d at 340. The supreme court further noted "[w]hen these three statutes converge, a court never considers the actual facts of the crime, including the defendant's age at the time of the crime or his or her individual level of culpability." *Id.*

¶ 73    The supreme court held that the mandatory life sentence "grossly distorts the factual realities of the case and does not accurately represent defendant's personal culpability such that it shocks the moral sense of the community. This moral sense is particularly true *** where a 15-year-old with one minute to contemplate his decision to participate in the incident and stood as a lookout during the shooting, but never handled a gun, is subject to life imprisonment with no possibility of parole–the same sentence applicable to the actual shooter." *Id.* at 341. The supreme court held that the multiple murder sentencing statute, as applied to the defendant there, violated the proportionate penalties clause. *Id.* at 343.

¶ 74    The facts in *Miller* are unique and its holding limited to a situation where the convergence of the automatic transfer statute, the accountability statute, and the multiple-murder sentencing statute resulted in mandatory life imprisonment without the possibility of parole for a 15-year-old lookout because the court was precluded from considering the actual facts of the case during sentencing. Unlike *Miller*, defendant here was the shooter and was not convicted on a theory of accountability. Also unlike *Miller*, defendant was not subject to a mandatory sentence of natural life imprisonment without possibility of parole, and the circuit court was not prevented by the convergence of the automatic transfer statute with the accountability statute and the multiple-murder sentencing statute from weighing the facts of the case as well as the evidence in aggravation and mitigation. Accordingly, *Miller* is inapposite and does not compel a holding that the automatic transfer statute as applied to defendant violated the proportionate penalties clause.

¶ 75    Next, defendant contends the automatic transfer statute violates the constitutional guarantee of substantive due process, which provides that a person may not be deprived of liberty without due process of law. *People v. Madrigal*, 241 Ill. 2d 463, 466 (2011). Our supreme court considered this issue in *People v. J.S.*, 103 Ill. 2d 395 (1984). In *J.S.*, the supreme court determined that the rational basis test was the appropriate standard for determining whether the automatic transfer statute comported with substantive due process. *Id.* at 402-04. Under the rational basis test, the statutory classification passes constitutional muster if it is rationally related to a legitimate state interest. *Id.* at 403. Our supreme court held that the automatic transfer statute's inclusion of murder, rape, deviate sexual assault, and armed robbery with a firearm, to the exclusion of other Class X felonies, in the class of cases in which 15- and 16-year-old defendants would be prosecuted under the Criminal Code of 1961, and not the Juvenile Court Act, was a rational classification. *Id.* at 404. The classification was "rationally based on the age of the offender and the threat posed by the offense[s] to the victim and the community because of [their] violent nature and frequency of commission." *Id.*

¶ 76    Defendant argues that *J.S.* should be "revisited" in light of *Roper* and *Graham*. Specifically, defendant contends the reasoning relied on in *J.S.* is no longer valid because "as *Roper* and *Graham* illustrate, it is not rational to automatically transfer 15- and 16-year-old

-16-

offenders to adult court without a hearing where none of the four legitimate penological justifications for adult sentences appl[ies] to juvenile offenders." Defendant's argument is without merit. As discussed *supra*, the *Roper* and *Graham* analysis related to constitutional challenges made to sentencing statutes under the eighth amendment; neither *Roper* nor *Graham* addressed a constitutional challenge made under the due process clause to nonsentencing statutes such as the one at issue here. Accordingly, *J.S.* remains good law and compels us to hold that defendant's substantive due process rights were not violated by his transfer to adult criminal court under the automatic transfer statute.

¶ 77 Defendant contends the broad principles set forth in *Roper* and *Graham* "transcend" the eighth amendment. We disagree. *Roper* and *Graham* specifically addressed whether the death penalty and natural life in prison without parole constituted cruel and unusual punishment for juveniles under the eighth amendment; neither *Roper* nor *Graham* purported to address any due process arguments. *Roper*'s and *Graham*'s eighth amendment analysis of their respective sentencing statutes has no application to defendant's due process argument relating to the automatic transfer statute.

¶ 78 Next, defendant contends the automatic transfer statute is violative of procedural due process. Procedural due process concerns the specific procedures employed in the statute and requires that defendant be given the opportunity to be heard at a meaningful time and in a meaningful manner. *People v. P.H.*, 145 Ill. 2d 209, 235 (1991). Defendant contends the automatic transfer statute fails to provide all the procedural due process to which he is entitled under the United States Supreme Court's holding in *Kent v. United States*, 383 U.S. 541 (1966). In *J.S.*, our supreme court considered this same argument and held that *Kent* was inapplicable and that the automatic transfer statute did not violate procedural due process. Our supreme court explained in relevant part:

"In *Kent*, a District of Colombia statute provided that juveniles 16 years of age who were charged with an offense which, if committed by an adult, would subject that person to a possible sentence of death or life imprisonment could be tried as adults if, after a 'full investigation,' the juvenile court judge determined that juvenile court jurisdiction should be waived. [Citation.] The Supreme Court held that, since the statute did not state standards to govern the juvenile court's determination, there could be a great variety of factors which might be considered and a disparity in the weight accorded these factors and that procedural due process would therefore require that a juvenile be accorded a hearing before waiver could be determined.

We cannot agree with defendants that the holding in *Kent* is dispositive of the instant case. [The automatic transfer statute] does not leave room for disparity in treatment between individuals within its proscription. All 15- and 16-year olds who have committed the enumerated offenses, which we have held were not arbitrarily or unreasonably selected by the legislature, are to be prosecuted in the adult criminal court system. There is no discretionary decision to be made by the juvenile court, and therefore we do not believe that the holding in *Kent* is dispositive herein." *J.S.*, 103 Ill. 2d at 405.

¶ 79 In accordance with *J.S.*, we reject defendant's procedural due process argument based on *Kent*.

¶ 80    Defendant argues that *J.S.* should be revisited in light of *Roper* and *Graham*. For all the reasons discussed *supra*, *J.S.* remains good law even after *Roper* and *Graham*. Accordingly, defendant's argument is unavailing.

¶ 81    Next, defendant contends the circuit court erred by refusing his request to give an instruction on second-degree murder based on an unreasonable belief in self-defense. A reviewing court will reverse the circuit court's determination about what jury instructions to give only if the circuit court abused its discretion. *People v. Polk*, 407 Ill. App. 3d 80, 107 (2010).

¶ 82    Defendant contends, since the circuit court gave the jury an instruction on self-defense, it abused its discretion by failing to also instruct the jury on second-degree murder. In support, defendant cites *People v. Lockett*, 82 Ill. 2d 546, 551 (1980), in which our supreme court held where evidence supports the giving of a self-defense instruction, it will also support an instruction for voluntary manslaughter (now known as second-degree murder). The supreme court noted that when given the self-defense instruction, the jury could reach one of three conclusions. *Id.* First, the jury could decide defendant did not have a subjective belief that use of force was necessary, in which case the verdict should be murder. *Id.* Second, the jury could determine defendant had a reasonable, subjective belief that the use of force was necessary, in which case the verdict should be not guilty. *Id.* at 551-52. Third, the jury could determine that defendant's subjective belief in the necessary use of force was unreasonable, in which case the verdict would be voluntary manslaughter, now second-degree murder. *Id.* at 552. The supreme court concluded:

> "It is not the province of the judge to weigh the evidence and decide if defendant's subjective belief was reasonable or unreasonable. The judge's duty is to determine if any evidence is presented that the defendant had a subjective belief. We can conceive of no circumstance when a judge could determine, as a matter of law, that a jury could find the defendant had a reasonable subjective belief the killing was justified, but that the jury could not find the defendant's subjective belief was unreasonable. So long as some evidence is presented from which a jury could conclude that defendant had a subjective belief, the jury should determine if the belief existed and, if so, whether that belief was reasonable or unreasonable. Consequently, we hold that *when the evidence supports submitting an instruction on justifiable use of force*, [*i.e.*, self-defense,] a tendered [instruction on second-degree murder] also should be given." (Emphasis added.) *Id.* at 553.

¶ 83    Defendant argues the circuit court here gave a self-defense instruction (over the State's objection) and, under *Lockett*, it also was required to give the second-degree murder instruction. However, under *Lockett*, we must first determine whether the *evidence* supported the giving of the self-defense instruction; in the absence of evidence supporting the giving of a self-defense instruction, defendant is not entitled to an instruction on second-degree murder.

¶ 84    In the present case, the evidence did not support submitting an instruction on self-defense, and therefore defendant was not entitled to an instruction on second-degree murder. A person is justified in the use of force in self-defense against another that is intended or

likely to cause death or great bodily harm when he reasonably believes such force is necessary to prevent imminent death or great bodily harm to himself or another or the commission of a forcible felony. 720 ILCS 5/7-1 (West 2008). We have held: "[r]aising the issue of self-defense requires as its sine qua non that defendant had admitted the killing." *People v. Lahori*, 13 Ill. App. 3d 572, 577 (1973). See also *People v. Hawkins*, 88 Ill. App. 3d 178, 182 (1980) ("self-defense presupposes that the accused committed the act"); *People v. Chatman*, 381 Ill. App. 3d 890, 898 (2008) ("[n]o instruction on self-defense *** is applicable to an act that a defendant denies committing"). We have explained that, where a defendant denies using any force against the victim, it follows that he could not reasonably have believed that force was necessary to protect himself. *People v. Diaz*, 101 Ill. App. 3d 903, 915 (1981).

¶ 85     In the present case, defendant never admitted he killed Sergio and, as such, never presented any evidence that he reasonably believed deadly force was necessary to prevent imminent death or great bodily harm to himself or another or the commission of a forcible felony. Defendant testified at trial that, after Sergio attempted to point his gun at him in the alley, they struggled and Sergio fired the gun without hitting defendant. Sergio eventually dropped the gun. Defendant picked up the gun and ran away. Defendant specifically testified he never touched the trigger, never shot the gun while he was in the alley, and that he did not shoot anyone. Detective O'Donnell testified, in rebuttal for the State, that he spoke with defendant in the emergency room following the shooting, and defendant stated that, during the struggle, he gained partial control over the gun and pulled the trigger three times. However, Detective O'Donnell never testified defendant admitted that any of the three shots struck Sergio. In fact, defendant's statement to Detective O'Donnell indicated none of the shots hit Sergio. Specifically, defendant stated the struggle continued even *after* the shots were fired, and, after the struggle was over, *Sergio shot defendant* in the head while he was running away.

¶ 86     During closing arguments, defendant's theory was *not* that he shot Sergio in self-defense to prevent imminent death, great bodily harm, or the commission of a forcible felony, or that Sergio was struck by a bullet during that struggle, but rather, that one of the Satan Disciples accidentally shot Sergio while attempting to shoot defendant.

¶ 87     "Self-defense is an affirmative defense, meaning that unless the State's evidence raises the issue involving the alleged defense, the defendant bears the burden of presenting evidence sufficient to raise the issue." *People v. Everette*, 141 Ill. 2d 147, 157 (1990). Defendant's claim that he did not shoot the gun and kill Sergio, and his concomitant failure to present any evidence that he believed deadly force was necessary to prevent imminent death or great bodily harm or a forcible felony, were inconsistent with, and cannot support the giving of, a self-defense instruction. We also note, none of the State's witnesses provided testimony supporting the giving of a self-defense instruction, where their testimony was that defendant was the aggressor in that, while armed with a gun he was holding out with an extended right arm, he approached the unarmed Sergio and shot him as he tried to run away. In the absence of any evidence supporting the giving of a self-defense instruction, defendant was not entitled to an instruction on second-degree murder.

¶ 88     As an alternative argument in support of the denial of the second-degree murder

instruction, the State argues this case is like *People v. Anderson*, 266 Ill. App. 3d 947 (1994), and *People v. Billups*, 404 Ill. App. 3d 1 (2010), which held that instructions on second-degree murder need not be given where the evidence indicates only two possible conclusions, that the defendant committed first-degree murder (if the State's witnesses are believed) or that he acted in self-defense (if the defense witnesses are believed) and where there is no evidence defendant's belief in self-defense was unreasonable. In *People v. Washington*, 399 Ill. App. 3d 664 (2010), a panel of the appellate court held *Anderson* was wrongly decided, and that under *Lockett*, an instruction on second-degree murder must be given in *all* cases where there is any evidence supporting a self-defense instruction, and that it is for the jury to determine whether the defendant's belief in self-defense was reasonable or unreasonable. Our supreme court has granted leave to appeal in *People v. Washington*, 237 Ill. 2d 586 (2010).

¶ 89     We need not address the State's alternative argument, or the cases it cites in support thereof, as we have already determined that the circuit court committed no abuse of discretion by denying the instruction on second-degree murder in the absence of any evidence supporting a self-defense instruction.

¶ 90     Next, defendant contends his trial counsel provided ineffective assistance. To determine whether defendant was denied his right to effective assistance of counsel, we apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, defendant must show "counsel's representation fell below an objective standard of reasonableness" (*id.* at 688), and second, he was prejudiced such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*id.* at 694).

¶ 91     To prevail on his claim of ineffective assistance, defendant must satisfy both prongs of the *Strickland* test. If we can dispose of defendant's ineffective assistance claim because he suffered no prejudice, we need not address whether his counsel's performance was objectively reasonable. *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011).

¶ 92     First, defendant contends his counsel provided ineffective assistance by failing to investigate, consider, and discuss with him whether involuntary manslaughter instructions should be tendered. A defendant commits involuntary manslaughter when he unintentionally kills another person without lawful justification by recklessly acting in a manner likely to cause death or great bodily harm. 720 ILCS 5/9-3 (West 2008).

¶ 93     The State presented evidence that defendant intentionally killed Sergio by a shot to the back of the head. Defendant presented evidence that he did not shoot and did not kill Sergio. There was no evidence that defendant recklessly killed Sergio. In the absence of any evidence of recklessness, defendant was not entitled to an involuntary manslaughter instruction. See *People v. Jones*, 175 Ill. 2d 126, 131-32 (1997) (a defendant is entitled to an instruction on his theory of the case only if there is some foundation for the instruction in the evidence.) Accordingly, defendant was not prejudiced by defense counsel's alleged failure to investigate, consider and discuss the tendering of involuntary manslaughter instructions, and therefore his claim of ineffective assistance fails.

¶ 94     Next, defendant contends his trial counsel provided ineffective assistance by failing to

understand *People v. Lynch*, 104 Ill. 2d 194 (1984), and by failing to introduce admissible *Lynch* evidence about Sergio's violent character. When self-defense is properly raised, defendant may offer evidence of the victim's violent and aggressive character for two reasons: (1) to show that defendant's knowledge of the victim's violent tendencies affected his perceptions of and reactions to the victim's behavior; and (2) to support defendant's version of the facts where there are conflicting accounts of what occurred. *Id.* at 199-200. However, *Lynch* only applies where the theory of self-defense is supported by the evidence. *People v. Figueroa*, 381 Ill. App. 3d 828, 842 (2008). As discussed *supra*, the theory of self-defense was not supported by the evidence. Accordingly, defendant was not entitled to introduce *Lynch* evidence and, therefore, defendant's claim of ineffective assistance premised on defense counsel's failure to introduce *Lynch* evidence fails.

¶ 95     Next, defendant contends his trial counsel provided ineffective assistance by failing to object to the State's comments during closing arguments that Berenice saw defendant "execute" Sergio by shooting him. Defendant argues that the record shows Berenice did not actually witness the shooting because she was looking in the other direction at the time Sergio was shot.

¶ 96     Defense counsel committed no ineffective assistance by failing to object to the State's comments. Prosecutors have great latitude in making their closing arguments, and such arguments are proper if they are based on the record or are reasonable inferences drawn therefrom. *People v. Moya*, 175 Ill. App. 3d 22, 24 (1988). Here, the prosecutor's comments were properly based on the evidence at trial and, as such, defense counsel committed no ineffective assistance by failing to object to them. Specifically, Berenice testified she saw defendant running behind Sergio while carrying a black object that he was holding out with an extended right arm. Berenice saw nobody else in the alley except for defendant and Sergio. Berenice saw Sergio try to open the gate to the yard next to where she lived. She turned away and heard four or five gunshots. When she turned back around, she saw Sergio lying on the ground by the gate, bleeding from the head, and she saw defendant running away. Sergio died from a gunshot wound to the back of his head. Berenice went to the police station, where she identified defendant from a photo array. The prosecutor asked Berenice whether defendant was "the person that [she] saw shoot Sergio." Berenice responded, "Yes." Berenice also testified she identified defendant from a lineup. The prosecutor showed Berenice a photograph of the lineup and asked her if she saw the person that she had identified "as the person that shot Sergio." Berenice responded "yes" and identified defendant. Officer Lorenz also testified that in the aftermath of the shooting, Berenice told him she had seen defendant shoot Sergio. The prosecutor's comments during closing arguments that Berenice witnessed defendant execute Sergio were properly based on her testimony and Officer Lorenz's testimony at trial and did not constitute error. As the prosecutor's comments were properly based on the evidence, defense counsel committed no ineffective assistance by failing to object to them.

¶ 97     Next, defendant contends his due process rights were violated when his counsel waived his presence at the jury instruction conference where there were discussions of instructions on lesser offenses. Defendant contends his absence from the jury instruction conference deprived him of the right to decide whether the jury should be instructed on the lesser

-21-

included offense of involuntary manslaughter. Defendant waived review by failing to raise the issue below. *People v. Bean*, 137 Ill. 2d 65, 80 (1990).

¶ 98 Even choosing to address the issue on the merits, we find no reversible error. Under the Illinois Constitution, a criminal defendant has the general right to be present at every stage of his trial, but the right is not itself a "substantial" one. *Id.* at 80-81. It is a "lesser right the observance of which is a means to securing the substantial rights of a defendant." *Id.* at 81. Defendant is denied his constitutional right of presence under the Illinois Constitution only when his absence results in the denial of an underlying constitutional right. *Id.*

¶ 99 Under the United States Constitution, defendant's right of presence arises from the due process clause of the fourteenth amendment and it is violated only when his absence results in his being denied a fair and just trial. *Id.* at 82-83.

¶ 100 Defendant's constitutional argument is premised on the failure to tender an involuntary manslaughter instruction at the jury instruction conference. However, as discussed *supra*, defendant was not entitled to an involuntary manslaughter instruction and therefore his presence at the conference would not have caused the instruction to be given. As such, his absence from the jury instruction conference did not deprive him of an underlying constitutional right or a fair and just trial. Accordingly, defendant was not deprived of his right of presence under the Illinois and United States Constitutions.

¶ 101 Next, defendant contends the State made improper remarks during closing arguments depriving him of a fair trial. Prosecutors have great latitude in making their closing arguments, and such arguments are proper if they are based on the record or are reasonable inferences drawn therefrom. *Moya*, 175 Ill. App. 3d at 24. Prosecutorial comments constitute reversible error only if they engender "substantial prejudice." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). Substantial prejudice occurs when "the improper remarks constituted a material factor in a defendant's conviction." *Id.*

¶ 102 In *Wheeler*, our supreme court applied a *de novo* standard of review to the issue of prosecutorial statements during closing arguments. *Id.* at 121. In *People v. Blue*, 189 Ill. 2d 99, 128 (2000), which was cited by *Wheeler*, our supreme court applied an abuse of discretion standard. We need not resolve the issue of the appropriate standard of review, because our holding affirming the circuit court would be the same under either standard.

¶ 103 First, defendant contends the prosecutor misstated the evidence when he argued that Berenice was an eye-witness to the shooting. Defendant's argument is without merit for the reasons stated earlier in this opinion.

¶ 104 Second, defendant contends the prosecutor misstated the evidence when he argued that defendant "had the audacity to throw his Two-Six gang sign" while he was being photographed for his arrest. Defendant contends the arrest photo shows defendant configuring his hand in a manner very different from the Two-Six gang sign that he demonstrated for the jury. We disagree. The photograph, which is contained in the record on appeal and is attached as an appendix to defendant's appellant's brief, depicts defendant's hand upside down making a bunny shape, with his first two fingers in a V position, his ring finger curved underneath his thumb, and his pinky touching his thumb. The photograph correlates to defendant's depiction of the Two-Six sign at trial which, as discussed above,

also was in the shape of a bunny.

¶ 105      Defendant also argues that the prosecutor misstated the evidence by stating he acted audaciously by purposely demonstrating his gang sign at the police station. Defendant contends it is "very likely" that the police asked him to display his hand to exhibit his tattoo. Defendant argues that, since his tattoo is on the inside of his middle finger, he had to move his other fingers out of the way to expose the tattoo. Defendant contends "[t]he evidence therefore suggests [he] was holding his hand that way to comply with the [police's] request to display his tattoo, not that he was flashing the hand sign of his gang."

¶ 106      Although that is one possible inference, another inference is the one stated by the prosecutor that defendant purposely and audaciously displayed his Two-Six gang symbol. As the inference made by the prosecutor was reasonable, it did not constitute reversible error under either an abuse of discretion standard of review or a *de novo* standard of review.

¶ 107      For the foregoing reasons, we affirm the circuit court.

¶ 108      Affirmed.