2026 IL App (1st) 171507-U
Order filed: June 24, 2026

FIRST DISTRICT
THIRD DIVISION

No. 1-17-1507

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 07 CR 21201 |
| | ) | |
| SAMUEL SALAS, | ) | Honorable |
| | ) | Erica L. Reddick, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Martin and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm the order denying defendant leave to file a successive postconviction petition.

¶ 2   Defendant, Samuel Salas, appeals the circuit court's order denying him leave to file a successive postconviction petition. We affirm.

¶ 3   The State charged defendant with the first-degree murder of the victim, Sergio Ojeda. At the jury trial, 12–year–old Emmanuel Torres testified that at approximately 3:40 p.m., on September 11, 2007, he was playing soccer down the street from his apartment building at 4511 South Spaulding Avenue. Ojeda was in an alley also playing soccer. Torres heard four or five gunshots, looked toward the alley, and saw a Hispanic male, in a white shirt and jeans with long,

"puffy" hair, shoot at Ojeda with a black gun from about two feet away. Ojeda did not have a gun in his hands. Torres did not get a good look at the shooter's face.

¶ 4     Torres ran across the street to a friend's house, went inside, and peeked out a window. Torres saw a group of "gangbangers," including three persons named Salvatore, Fernando Diaz, and Vince Denova, beating the shooter.

¶ 5     Torres spoke to police after the shooting and stated that he saw a male in a white shirt shoot Ojeda four or five times.

¶ 6     Berenice Lopez testified that, on September 11, 2007, she lived on the second floor of an apartment building at 4531 South Spaulding Avenue in Chicago. Ojeda was her neighbor. Shortly before 6 p.m., Lopez was outside her building and saw Ojeda two houses away, walking toward an alley with Diaz, Salvatore, and a person named Rego. A few moments later, Lopez saw Ojeda in the alley, running toward 45th Street with nothing in his hands. He was being chased by defendant, who was wearing a white shirt and jeans and carrying a black object in his hand that he was holding out with an extended right arm. Lopez turned away and heard four or five gunshots, then turned back around and saw defendant running toward 46th Street. Ojeda was lying on the ground by the gate to her backyard.

¶ 7     Lopez saw that Ojeda was bleeding from the head and she screamed for someone to call 911. Then she saw Diaz, Fernando Rodriguez and Denova run over to defendant and begin to beat him. Lopez approached them and told them to stop. Defendant grabbed Lopez and pulled her on top of him. As she tried to get up, Lopez saw a gun on the ground, which was most likely dropped by defendant because it fell on her side and he was the only other person on the ground near her. Diaz picked up the gun with his shirt and began running toward 46th Street and Sawyer Avenue. The police arrived and defendant ran.

¶ 8     On September 11, 2007, Lopez went to the police station and picked defendant out of a photo array and identified him as the person who shot Ojeda. On October 3, 2007, she picked defendant out of a lineup.

¶ 9     Yvonne Nevarez testified that, on September 11, 2007, she was living at 4546 South Spaulding Avenue in Chicago. At approximately 6 p.m., she was in the alley when she heard a noise and saw defendant, who was wearing jean shorts and a white T-shirt, running toward her with a black gun in his hand. Defendant ran inside her house, and she followed him and told him to get out. Defendant said, "Save me" and then he left out the front door with the gun still in his hand. Defendant crossed the street, where other teenage boys began beating him. Nevarez called 911.

¶ 10     Later that evening, a detective came to Nevarez's house and showed her a series of photographs. She identified a photograph of defendant as the person who entered her house with a gun. On October 3, 2007, Nevarez went to the police station and picked defendant out of a lineup.

¶ 11     Vincent Denova testified that, on September 11, 2007, he lived at 4637 South Spaulding Avenue in Chicago and was a member of the Satan Disciples. At approximately 6 p.m., he was in the alley between Spaulding and Sawyer Avenues playing soccer with Ojeda, Diaz, Salvatore, Rodriguez, and Rego. They stopped playing when the ball went over a gate. Ojeda went through the gangway toward the alley to retrieve the ball. Denova followed him from a couple of feet away. When Ojeda reached the alley, he turned to the left and began running from a light-skinned, Hispanic male, wearing a white shirt and holding a gun. Denova heard four or five gunshots and hid between a couple of nearby buildings. He did not see the shooter's face.

¶ 12     After the shooting stopped, Denova saw that Ojeda was lying face down on the ground and he heard Lopez screaming that Ojeda had been shot. Denova also heard Salvatore and Lopez say,

"He's right there." People were pointing at the young man in a white shirt who was standing nearby.

¶ 13    Denova, Diaz, Rodriguez, and Salvatore began beating the man in the white shirt, who fell to the ground. Denova kicked him and hit him with a brick and saw a gun fall from his waist. Lopez ran over and tried to stop them from beating him. The man grabbed Lopez and pulled her down on top of him. Denova kicked him in the face and he let her go. The police arrived and the man got up and ran away.

¶ 14    Police officers showed Denova some photographs, on September 11, 2007, and asked him if he could identify the man in the white shirt who had been holding the gun. Denova was unable to identify anyone.

¶ 15    Diaz testified that in September 2007 he lived at 5026 South Spaulding Avenue and was a member of the Satan Disciples. At approximately 6 p.m., on September 11, 2007, he was in the alley between Sawyer and Spaulding Avenues and 45th and 46th Streets playing soccer and drinking beer with Ojeda, Salvatore, Denova, Rodriguez, and Rego. After they stopped playing, Ojeda began walking back toward the alley. Diaz and Salvatore followed from behind.

¶ 16    In the alley, Diaz saw defendant get off a bicycle, pull out a gun, and begin running. Diaz heard five or six gunshots but did not see the actual shooting because when the shots rang out, he ran and hid. After the shooting stopped, Diaz and Salvatore went back to the alley and saw defendant holding a gun, which he pointed at Diaz. Defendant tried to fire the weapon twice, but it just clicked because it was out of bullets. Defendant ran away but later returned to 46th Street and Spaulding Avenue, where Rodriguez knocked him down and hit him with a brick. Diaz and Denova also began hitting and kicking defendant. Lopez ran over and told them to stop. The gun fell during the altercation. Diaz grabbed the gun and began running. Police stopped him at 46th

Street and Sawyer Avenue.

¶ 17     Officer Ronald Reed testified he was working in uniform in a marked car with his partner, Officer Lorenz, on September 11, 2007, when he was assigned to the 4500 block of South Spaulding Avenue. When they arrived on the block, they saw people pointing at defendant, who was standing on the sidewalk and bleeding from his head. They were saying, "He shot my guy."

¶ 18     Reed exited his vehicle. Defendant began to run away, eastbound, through the gangway. Reed and Lorenz chased after defendant and eventually apprehended him. Defendant did not have any weapons on him.

¶ 19     After they apprehended defendant, a couple of Drug Enforcement Administration (DEA) agents at the end of the alley yelled, "We have another one down here." Reed walked over and saw they had detained Diaz. There was a black gun on the ground near him. Reed placed Diaz in custody and secured the gun.

¶ 20     Lorenz testified that, after the arrest, he located Ojeda, who was lying on the ground with a gunshot wound to the back of his head. Lorenz called for an ambulance and spoke with Lopez, who told him she saw defendant come up to Ojeda and shoot him once in the head.

¶ 21     Keith Landa, a DEA special agent, testified that, at approximately 6 p.m., on September 11, 2007, he was in the area of the 4500 block of South Sawyer Avenue with some other DEA agents, conducting surveillance of a drug-trafficking organization. Landa heard several gunshots and saw Diaz run away with a gun near his waistband. Landa and his fellow agents drew their guns, identified themselves, and ordered Diaz to the ground. He complied. Landa turned Diaz and the gun over to Reed.

¶ 22     Detective John Henry testified that he received an assignment shortly after 6 p.m. to investigate Ojeda's shooting death. He went to the alley at 4531 South Spaulding Avenue, where

he observed Ojeda's body lying on his back, covered in a white sheet. Henry returned to the police station, where he spoke with Lopez and showed her a photo array from which she identified defendant as the person she saw chasing Ojeda with a gun. On October 3, 2007, Lopez viewed a lineup and again identified defendant.

¶ 23    Doctor Michel Humilier testified he performed the autopsy on Ojeda. His external examination revealed a gunshot wound on the back of the right side of the head, behind the ear, that had a ring of abrasion around the wound. Doctor Humilier concluded that Ojeda died of a gunshot wound to the head and the manner of his death was homicide.

¶ 24    Defendant testified that he was 16 years old, on September 11, 2007, and was a member of the Two–Six street gang. At approximately 5 p.m., he was riding a bicycle on Spaulding Avenue and saw a group of boys he did not know near 46th Street. Defendant turned right on 46th Street in order to avoid them and then turned left into an alley between Spaulding and Sawyer Avenues.

¶ 25    As he rode down the alley, defendant saw a Hispanic male come out of a gangway on the left side and flash a Satan Disciples gang sign toward him. Defendant became afraid because he knew that the Satan Disciples were rivals of his Two-Six gang.

¶ 26    Defendant could have turned around and avoided any confrontation. Instead, he continued to ride the bicycle in the direction of the man flashing the Satan Disciples gang sign. When defendant was within approximately four feet of him, the man pulled a gun from his right pocket and tried to point it at defendant. Defendant jumped off the bicycle and grabbed his arm. They struggled, and the man fired the gun without hitting defendant. The gun dropped to the ground and defendant picked it up and ran to the bicycle. Defendant testified he never touched the trigger, he never shot the gun while he was in the alley and he did not shoot anyone.

¶ 27    Defendant rode the bicycle as fast as he could out of the alley toward 46th Street. Defendant

thought there was a third person in the alley because as he rode toward 46th Street, he heard gunshots and felt "heat flying past [his] head." When defendant reached the end of the alley, he turned right onto 46th Street and went across Spaulding Avenue toward another alley, where his bicycle chain broke. Defendant jumped off the bicycle and saw "a whole group of guys" were chasing him. He ran into the alley, still armed with the gun.

¶ 28    In the alley, defendant saw an open door to a house and ran inside and screamed for help. The people inside the house told him to get out. He ran out the front door, through the yard, back onto Spaulding Avenue, where he again encountered the group who had been chasing him. Defendant turned around and attempted to run into a gangway, but he slipped and fell to the ground. The group caught up to him and began punching and kicking him and hitting him with bricks. Defendant fell to the ground, dropped the gun, and put his hands over his head and his knees to his chest.

¶ 29    The beating slowed down when two women, one older and one younger, screamed for them to stop punching and kicking him. Defendant reached up and pulled the younger woman on top of him in an effort to protect himself. Then he got up and ran away.

¶ 30    Defendant ran through the gangway, across the alley, and into a yard, where police officers caught him. He was taken to the hospital for treatment of the injuries he received from the beating. At the hospital, a detective asked him questions. Defendant did not remember most of the questions that were asked of him or the answers that he gave. He remembered only that he told the detective that he fought with someone and gained control of the gun. He did not remember telling the detective that he fired the gun three times.

¶ 31    Detective Michael O'Donnell testified for the State in rebuttal that he went to the hospital on the evening of September 11, 2007. O'Donnell gave defendant his *Miranda* warnings and spoke

with him in the emergency room. Defendant denied having a gun or any involvement in the shooting.

¶ 32    After this brief conversation, O'Donnell left the emergency room, contacted personnel at the scene of the crime, and had a discussion with them. A short time later, he returned to the emergency room, told defendant he was under arrest, and asked if he still wished to talk. Defendant told O'Donnell he had been riding his bicycle down Sawyer Avenue, when a person nicknamed AKD came out of the gangway, said "What's up," and pulled out a black, semiautomatic handgun and fired a shot at him. Defendant struggled with AKD, gained "partial control over the weapon," and pulled the trigger three times. The struggle continued, and at some point, the gun was knocked to the ground and defendant started to run away. Defendant stated that AKD then shot him in the head. O'Donnell subsequently spoke with defendant's doctor about his injuries. The doctor said defendant did not have a gunshot wound but that he had lateral fractures to the skull indicative of blunt force trauma.

¶ 33    Following the testimony, the court conducted a jury instruction conference. Defendant tendered an instruction on self-defense, which the court gave over the State's objection. Defendant also tendered an instruction on second-degree murder based on an unreasonable belief in self-defense, which the court denied.

¶ 34    The jury convicted defendant of first-degree murder and the court sentenced him to 50 years' imprisonment. Defendant filed a direct appeal which we now discuss in some detail because our resolution of the direct appeal provides the basis for his current claim that he is entitled to leave to file a successive postconviction petition.

¶ 35    On direct appeal, defendant argued, in pertinent part, that once the trial court gave the jury an instruction on self-defense, it abused its discretion by denying his tendered instruction on

second-degree murder based on an unreasonable belief in self-defense. *People v. Salas*, 2011 IL App (1st) 091880, ¶ 82. In support, defendant cited an Illinois Supreme Court case, *People v. Lockett*, 82 Ill. 2d 546 (1980). In *Lockett*, the supreme court noted that, when given the self-defense instruction, the jury can reach one of three possible conclusions. *Id.* at 551. First, the jury could decide that defendant did not have a subjective belief that the use of force was necessary, in which case he should be convicted of murder. *Id.* Second, the jury could decide that defendant had a reasonable, subjective belief that the use of force was necessary, in which case he should be acquitted as having lawfully acted in self-defense. *Id.* at 551-52. Third, the jury could determine that defendant subjectively believed that the use of force was necessary, but that such a belief was unreasonable, in which case he should be convicted of voluntary manslaughter, now second-degree murder. *Id.* at 552. The supreme court concluded:

"So long as some evidence is presented from which a jury could conclude that defendant had a subjective belief, the jury should determine if the belief existed and, if so, whether that belief was reasonable or unreasonable. Consequently, we hold that *when the evidence supports submitting an instruction on justifiable use of force*, a tendered [instruction on second-degree murder] also should be given." (Emphasis added.) *Id.* at 553.

¶ 36 Defendant asked us to find that, under *Lockett*, the trial court abused its discretion by failing to give the tendered second-degree murder instruction along with the self-defense instruction. *Salas*, 2011 IL App (1st) 091880, ¶ 83. We noted that the preliminary inquiry under *Lockett* was whether *the evidence* supported the giving of the self-defense instruction in the first instance. *Id.* If the evidence supported the giving of the self-defense instruction, then defendant also was entitled to the tendered second-degree murder instruction; however, if the evidence did not support

the giving of a self-defense instruction, then he was not entitled to the second-degree murder instruction. *Id.*

¶ 37    In accordance with *Lockett*, we proceeded to address the evidence supporting the giving of the self-defense instruction. We began by noting that a person is justified in the use of deadly force in self-defense when he reasonably believes such force is necessary to prevent imminent death or great bodily harm to himself or another or the commission of a forcible felony. *Id. ¶* 84 (citing 720 ILCS 5/7-1 (West 2008)). We also cited long-standing Illinois case law holding that a claim of self-defense presupposes that defendant actually used deadly force. *Salas*, 2011 IL App (1st) 091880, ¶ 84 (citing *People v. Lahori*, 13 Ill. App. 3d 572, 577 (1973); *People v. Hawkins*, 88 Ill. App. 3d 178, 182 (1980); *People v. Diaz*, 101 Ill. App. 3d 903, 915 (1981)).

¶ 38    Examining the evidence at trial, we detailed how defendant never admitted killing Ojeda but instead testified that they got into a fight during which Ojeda pulled out a gun, which he dropped. *Salas*, 2011 IL App (1st) 091880, ¶ 85. Defendant testified he picked up the gun and ran away without ever touching the trigger or firing it. *Id.* We also recounted O'Donnell's testimony about his conversation with defendant during which defendant stated that in the course of the fight, he gained partial control over the gun and pulled the trigger three times. *Id.* However, defendant never admitted that any of the three shots struck Ojeda. *Id.* To the contrary, defendant stated the struggle continued even after the shots were fired and that after the fight concluded, *Ojeda shot defendant* in the head while he was running away. *Id.*

¶ 39    We concluded that defendant's and O'Donnell's testimony indicated that defendant was *not* admitting to shooting and killing Ojeda, and that the failure to admit to the shooting was inconsistent with and cannot support the giving of a self-defense instruction because self-defense presupposes the use of deadly force in defense of one's person. *Id.* ¶ 87. We also noted that none

of the State's eyewitnesses provided testimony supporting the giving of a self-defense instruction, because their testimony was that defendant was the aggressor. *Id.* In the absence of any evidence supporting the giving of the instruction on self-defense, *Lockett* dictated that defendant was not entitled to an instruction on second-degree murder based on the unreasonable belief in self-defense. *Id.* Therefore, we affirmed defendant's conviction. *Id.* ¶ 107.

¶ 40    On April 22, 2013, defendant filed a postconviction petition alleging that his trial counsel provided ineffective assistance by failing to argue that his statement to O'Donnell was involuntary because there was no concerned adult present. *People v. Salas*, 2015 IL App (1st) 132280-U, ¶ 42. Defendant also argued that his appellate counsel was ineffective on direct appeal for failing to argue trial counsel's ineffectiveness. *Id.* The postconviction court dismissed defendant's petition at the first stage as frivolous and patently without merit because his statement to O'Donnell was voluntary. *Id.* ¶ 43. We affirmed. *Id.* ¶¶ 62-65.

¶ 41    On January 31, 2017, defendant filed a motion for leave to file a successive petition for postconviction relief, alleging that his sentence was unconstitutional under the eighth amendment and *Miller v. Alabama*, 567 U.S. 460 (2012) and that the trial court erred by not instructing the jury about second-degree murder based on an unreasonable belief in self-defense. The postconviction court denied leave to file on April 21, 2017, ruling that defendant's sentence was constitutional because it was not a *de facto* life sentence and his claim about second-degree murder instructions was barred by *res judicata* as it had been raised and rejected on direct appeal. Defendant mailed his notice of appeal on May 14, 2017, and it was file stamped by the circuit court on May 23, 2017.

¶ 42    Subsequent to the filing of the notice of appeal, defendant filed multiple *pro se* motions in the circuit court asking it to reconsider the denial of his motion for leave to file a successive

petition. On August 28, 2017, the circuit court appointed the Cook County Public Defender's Office to represent defendant on the rehearing petitions. The case was continued numerous times in 2017, 2018, and 2019. On June 28, 2019, defendant filed (through counsel) another motion to reconsider the denial of his motion for leave to file a successive postconviction petition on the sentencing issue, arguing that his 50-year sentence was a *de facto* life sentence under *People v. Buffer*, 2019 IL 122327, which violated the eighth amendment.

¶ 43    On August 1, 2019, we granted defendant's motion to stay his appeal from the order denying his motion for leave to file a successive postconviction petition pending resolution of his petitions for rehearing in the circuit court.

¶ 44    On April 17, 2025, the circuit court granted defendant relief on his postconviction sentencing issue and resentenced him to 30 years in prison. No relief was granted on the instructional issue and the parties are in agreement that there are no pending proceedings in the circuit court related to that issue.

¶ 45    On June 2, 2025, we lifted the stay on the instant appeal from the order denying defendant leave to file a successive postconviction petition. The only issue on this appeal is whether the postconviction court erred by denying defendant leave to file his successive petition premised on the failure to instruct the jury about second-degree murder based on an unreasonable belief in self-defense. No argument is made with respect to defendant's sentence.

¶ 46    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(a)(1) (West 2024)) allows a criminal defendant to challenge his conviction by showing that in the underlying criminal proceedings there was a "substantial denial" of his rights under the federal or state constitutions. The Act only contemplates the filing of one such petition. *Id.* § 122-1(f). Any issues that were decided on direct appeal are barred by *res judicata*. *People v. Tenner*, 206 Ill. 2d 381, 392 (2002).

However, the procedural bar of *res judicata* may be overcome where fundamental fairness requires. *People v. Pitsonbarger*, 205 Ill. 2d 444, 458 (2002). In proceedings under the Act, fundamental fairness is established by satisfying the cause and prejudice test which is codified in section 122-1(f) of the Act. 725 ILCS 5/122-1(f) (West 2024).

¶ 47 Under the cause and prejudice test, claims in a successive petition are barred unless defendant shows good cause for failing to raise the error in the prior postconviction petition and actual prejudice resulting from the error. *Id.* To establish "cause," defendant must show some objective factor impeded his ability to raise that claim in the initial postconviction proceeding. *Tenner*, 206 Ill. 2d at 393. To establish "prejudice," defendant must show the claimed constitutional error so infected his trial that the resulting conviction violated due process. *Id.* We review the denial of leave to file a successive petition *de novo*. *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 25.

¶ 48 Defendant does not dispute that *res judicata* ordinarily would apply here to bar his successive, postconviction claim of instructional error based on the trial court's failure to instruct on second-degree murder, where the exact same issue was raised and rejected on direct appeal. Defendant claims, though, that cases such as *People v. Partee*, 268 Ill. App. 3d 857, 864-65 (1994), and *People v. Womack*, 2020 IL App (3d) 170208, hold that cause exists for relaxing the procedural bar of *res judicata* where relevant case law recently has changed. Defendant argues that since the direct appeal in this case, the Illinois Supreme Court has issued two decisions, *People v. Washington*, 2012 IL 110283, and *People v. McDonald*, 2016 IL 118882, "clarifying the standard for the receipt of second-degree murder instructions" and making clear that our decision on direct appeal rejecting his claim of instructional error was erroneous. Therefore, defendant asserts that cause exists for the filing of a successive petition incorporating *Washington* and *McDonald* into

his argument for a new trial based on the failure to instruct on second-degree murder. We proceed to examine *Washington* and *McDonald*.

¶ 49 In *Washington*, 2012 IL 110283, the evidence at trial showed that a person driving defendant's girlfriend's automobile was involved in an accident with the driver of another vehicle, Antoine Lee. *Id.* ¶ 3. Family members of both drivers were called and came to the scene. *Id.* Defendant arrived and engaged in an argument with Lee and his family members, including Lee's uncle and cousin. *Id.* During the course of the argument, defendant shot and killed the cousin. *Id.* ¶¶ 3-14. At the jury instruction conference, defendant tendered instructions for self-defense and for second-degree murder based on an unreasonable belief in self-defense. *Id.* ¶ 15. The court gave the self-defense instruction and denied the second-degree murder instruction. *Id.* The jury convicted defendant of two counts of first-degree murder and one count of aggravated battery with a firearm. *Id.* ¶ 1. Relying on *Lockett*, 82 Ill. 2d at 546, the appellate court reversed and remanded, holding that after instructing the jury on self-defense, the trial court erred by refusing to also instruct it on second-degree murder based on an unreasonable belief in self-defense. *Washington*, 2012 IL 110283, ¶ 21.

¶ 50 The State appealed to the supreme court, arguing that *Lockett* did not hold that such a second-degree murder instruction must be given as a mandatory counterpart to a self-defense instruction in all murder cases. *Id.* ¶ 25. On the State's appeal, the supreme court reexamined *Lockett* in some detail and specifically noted its holding that " 'when the evidence supports submitting an instruction on justifiable use of force, a tendered [instruction] on [second-degree murder] also should be given.' " *Id.* ¶ 23 (quoting *Lockett*, 82 Ill. 2d at 553). The supreme court concluded that "[r]eading *Lockett* as a whole convinces us that this court intended to set forth a mandatory requirement" (i*d.* ¶ 29) and further stated: "We today reiterate *Lockett*'s holding that

when the evidence supports the giving of a jury instruction on self-defense, an instruction on second degree murder must be given as a mandatory counterpart." *Id.* ¶ 56.

¶ 51     In *McDonald*, 2016 IL 118882, the jury convicted defendant of the first-degree murder of the victim, his boyfriend. *Id.* ¶ 1. The incident took place during a physical altercation during which defendant stabbed the victim in the face. *Id.* ¶ 1, ¶ 5. There was evidence at trial that defendant thought the victim was having an affair and that they engaged in a fight over the use of a bicycle prior to the stabbing. *Id.* ¶¶ 6-7. The trial court instructed the jury on second-degree murder based on the unreasonable belief in self-defense but declined to give instructions on second-degree murder due to serious provocation. *Id.* ¶ 17. The appellate court affirmed defendant's conviction, rejecting his argument that the trial court erred by refusing to give the instruction on second-degree murder based on serious provocation. *Id.* ¶ 19. The supreme court granted defendant leave to appeal. *Id.*

¶ 52     The supreme court first addressed the question of the quantum of evidence required for a trial court to give an instruction on a lesser-included offense, noting that it "has at times been less than clear about the standard to be used in determining whether sufficient evidence exists to warrant the giving of a jury instruction." *Id.* ¶ 23. Some cases had held that an instruction is justified if *some credible* evidence exists that would reduce the charged offense to a lesser offense, while other cases held an instruction on a lesser offense should be given where the record contains *some evidence* to support the giving of the instruction. *Id.* The supreme court stated:

> "We hold that the appropriate standard for determining whether a defendant is
>
> entitled to a jury instruction on a lesser-included offense is whether there is *some evidence*
>
> in the record that, if believed by the jury, will reduce the crime charged to a lesser offense,
>
> not whether there is *some credible* evidence. It is not the province of the trial court to weigh

the evidence when deciding whether a jury instruction is justified. [Citations.] Requiring that credible evidence exist in the record risks the trial court invading the function of the jury and substituting its own credibility determination for that of the jury." (Emphasis in the original.) *Id.* ¶ 25.

¶ 53 The supreme court then affirmed defendant's conviction, finding there was not even "some" evidence of serious provocation warranting the requested jury instruction. *Id.* ¶ 67.

¶ 54 Defendant here argues that *Washington* and *McDonald* provide a "new framework" for analyzing whether second-degree murder instructions must be given in conjunction with self-defense instructions. According to defendant, prior to *Washington* and *McDonald*, there was some uncertainty in the case law as to whether a tendered second-degree murder instruction based on an unreasonable belief in self-defense must always be given when a self-defense instruction is given, or whether the trial court has the discretion to refuse the second-degree murder instruction if it determines that the evidence only supports a reasonable belief in self-defense. Defendant contends that *Washington* and *McDonald* resolved this uncertainty by unequivocally holding that where there is "some evidence" supporting the giving of a self-defense instruction, the trial court has no discretion to deny a tendered instruction on second-degree murder based on an unreasonable belief in self-defense. Defendant argues that this recent clarification of the law since the time of his direct appeal provides the requisite cause for his filing of a successive postconviction petition.

¶ 55 Initially, we note that defendant misconstrues the cause and prejudice test when he asserts that the supposed change in case law since the time of his direct appeal provides the cause for filing a successive postconviction petition. Under section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2024)), defendant must show that the change in case law occurred, not simply since the time of his direct appeal, but *subsequent to the initial postconviction proceedings*. If the change in

case law occurred since the time of the direct appeal but *prior* to the initial postconviction proceedings, then there was no cause preventing him from arguing the change in case law as a basis for postconviction relief in his initial petition.

¶ 56    *Washington* was decided in January 2012, which was over a year *prior* to the filing of his initial postconviction petition in April 2013 and therefore could have been raised during those initial proceedings. Defendant points us to an affidavit he filed in connection with his motion for leave to file a successive petition, in which he avers to the difficulties he had in accessing the law library between January 2012 and April 2013 due to prison lockdowns and periods of time when he was segregated from the general prison population. Defendant asks us to find that his limited access to the law library was cause for him not raising *Washington* in his initial postconviction petition. However, defendant admits in his affidavit that even with the lockdowns and segregation from the general prison population, there were periods of time when he could request case law be mailed or delivered to him. Although sometimes his requests were "lost in the mail" or "not what [he] requested," defendant never specifically attested that he made a request for a copy of *Washington* or that he was in any way impeded from accessing that particular case. As such, defendant has not shown any cause for his failure to raise *Washington* in his initial petition.

¶ 57    A second reason defendant has not satisfied the cause and prejudice test is because neither *Washington* nor *McDonald* represent a significant change or development in the relevant case law which would require the relaxation of the procedural bar of *res judicata*. Prior to both *Washington* and *McDonald*, the Illinois Supreme Court issued *Lockett*, 82 Ill. 2d at 553, which unequivocally held that "when the evidence supports submitting an instruction on justifiable use of force, a tendered [instruction] on voluntary manslaughter [now second-degree murder] also should be

given." *Washington* did not create any new law on this instructional issue but simply reaffirmed *Lockett's* holding. See *Washington*, 2012 IL 110283, ¶ 56.

¶ 58    *McDonald*, 2016 IL 118882, clarified that the appropriate standard for determining whether a defendant is entitled to a jury instruction on a lesser-included offense is whether there is *some evidence* in the record supporting the giving of the instruction. *Id.* ¶ 25. *McDonald* did not create any new law on this issue but effectively reaffirmed *Lockett*, which also used the "some evidence" standard when determining whether a second-degree murder instruction based on an unreasonable belief in self-defense must be given in conjunction with a self-defense instruction. See *Lockett*, 82 Ill. 2d at 553.

¶ 59    In the instant case, we relied extensively on *Lockett* when rejecting defendant's claim on direct appeal that the trial court erred by failing to instruct the jury on second-degree murder premised on the unreasonable belief in self-defense. See *Salas*, 2011 IL App (1st) 091880, ¶¶ 82-87. As neither *Washington* nor *McDonald* in any way changed or modified *Lockett* or its analysis of the instructional issue, our opinion in *Salas* remains good law and there is no cause for relaxing the procedural bar of *res judicata* and reconsidering the issue in a successive postconviction petition.

¶ 60    We note that in arguing cause, defendant spends considerable time recounting our alleged errors in the opinion we issued on his direct appeal. Those alleged errors are not properly before us in this postconviction proceeding because, as discussed, there has been no change in the case law relied on in the direct appeal which would necessitate reconsideration of our opinion under notions of fundamental fairness. Further, as aptly noted by the State, postconviction relief may be had under the Act only where defendant shows a denial of his constitutional rights "in the proceedings which resulted in [his] conviction" (725 ILCS 5/122-1(a)(1) (West 2024)). In other

words, postconviction relief is limited to remedying constitutional errors that occurred at trial or the sentencing hearing. *People v. Towns*, 182 Ill. 2d 491, 502 (1998). Defendant cites no authority holding that an alleged error committed by the appellate court when deciding his direct appeal may serve as the basis for a postconviction claim. The appropriate remedy for an alleged error in the appellate court opinion is to appeal to our supreme court. Defendant filed such a petition for leave to appeal in this case but the supreme court denied the petition. See *People v. Salas*, No. 113842 (Mar. 28, 2012).

¶ 61    However, *even if* we expressly considered all of defendant's arguments as to why our opinion on the direct appeal in *Salas* was wrongly decided, the outcome here would be the same.

¶ 62    First, defendant argues that we erred in *Salas* when we found that he was not entitled to a self-defense instruction because he "never admitted he killed [Ojeda] and, as such, never presented any evidence that he *reasonably believed deadly force was necessary* to prevent imminent death or great bodily harm to himself or another or the commission of a forcible felony." (Emphasis added.) *Salas*, 2011 IL App (1st) 091880, ¶ 85. Defendant argues that under *Washington* and *Lockett*, " '[s]o long as some evidence is presented from which a jury could conclude that defendant had a subjective belief [that the use of force was necessary for self-defense], the jury should determine if the belief existed and, if so, whether that belief was reasonable or unreasonable.' " *Washington*, 2012 IL 110283, ¶ 23 (quoting *Lockett*, 82 Ill. 2d at 553). Defendant argues that we wrongly invaded the province of the jury by making a determination as to the reasonableness of his belief in the use of deadly force.

¶ 63    Careful review of *Salas* shows that we did not invade the province of the jury by making a finding as to the reasonableness or unreasonableness of defendant's belief in the need for the use of force in self-defense. Rather, our analysis in *Salas* focused on *Lockett*'s pronouncement that "

'when the evidence supports submitting an instruction on justifiable use of force, [*i.e,* self-defense,] a tendered [instruction on second-degree murder] also should be given.' " *Salas*, 2011 IL App (1st) 091880, ¶ 82 (quoting *Lockett*, 82 Ill. 2d at 553). In accordance with *Lockett*, we examined the evidence at trial, which showed that defendant denied killing the victim and therefore that he was not entitled to a self-defense instruction under well-established case law holding that " '[r]aising the issue of self-defense requires as its sine qua non that defendant had admitted the killing.' " *Id.* ¶ 84 (quoting *Lahori*, 13 Ill. App. 3d at 577). We made no finding as to the reasonableness of defendant's decision to use deadly force but, rather, held that his claim that he *never* used deadly force precluded the giving of a self-defense instruction (and concomitantly, a second-degree murder instruction). Our analysis of this issue was consistent with *Lockett* and did not constitute error.

¶ 64 Next, defendant argues that we erred in *Salas* by "cherry picking" which trial evidence to accept when determining that he was not entitled to a self-defense instruction. Defendant asserts that we relied only on his own testimony denying firing the gun while ignoring O'Donnell's testimony that defendant admitted pulling the trigger three times while engaged in a fight with Ojeda. Defendant contends that O'Donnell's testimony provided "some evidence" supporting the giving of the self-defense instruction.

¶ 65 Careful review of *Salas* shows that we did not ignore O'Donnell's testimony but instead specifically considered his statement that defendant admitted to gaining partial control over the gun while struggling with Ojeda and pulling the trigger three times. *Id.* ¶ 85. We noted, though:

"Detective O'Donnell never testified defendant admitted that any of the three shots struck [Ojeda]. In fact, defendant's statement to Detective O'Donnell indicated none of the shots hit [Ojeda]. Specifically, defendant stated the struggle continued even *after* the shots were

fired, and, after the struggle was over, [*Ojeda*] *shot defendant* in the head while he was running away." (Emphasis in the original.) *Id.*

¶ 66    Contrary to defendant's argument, then, we expressly considered whether O'Donnell's testimony provided some evidence supporting the giving of a self-defense instruction and determined that it did not because his testimony did not show that defendant admitted killing Ojeda, which, as discussed, was a prerequisite for the giving of such an instruction.

¶ 67    Next, defendant argues that we erred in *Salas* by holding that he must admit to intentionally pulling the trigger in order to receive a self-defense instruction. Defendant contends that our holding violates the well-established rule that "a homicide defendant is entitled to an instruction on self-defense where there is some evidence in the record that, if believed by a jury, would support the defense, even where the defendant testifies that he *accidentally* killed the victim." (Emphasis added.) *McDonald*, 2016 IL 118882, ¶ 29 (citing *People v. Everette*, 141 Ill. 2d 147, 156-57 (1990)).

¶ 68    Careful review of *Salas* shows that we never held that defendant must admit to *intentionally* pulling the trigger and killing the victim before receiving an instruction on self-defense and thus we did not run afoul of *McDonald* or *Everette*. Instead, our holding was that in the absence of *any* showing by defendant that he shot and killed Ojeda (whether intentionally *or* by accident), he was not entitled to a self-defense instruction.

¶ 69    This case is similar to *People v. Lewis*, 2015 IL App (1st) 122411. In *Lewis*, a jury convicted defendant of first-degree murder. *Id.* ¶ 1. At trial, the State's witness testified defendant shot the victim. *Id.* ¶ 13. The defense witness testified defendant was not the shooter and that someone else shot the victim. *Id.* ¶ 35. During the instructions conference, defendant requested an instruction on self-defense which the trial court denied, reasoning that there had been no testimony,

"obviously other than the State's witnesses," that defendant shot the victim. *Id.* ¶ 42. On appeal, defendant cited *Everette*'s holding that a defendant is entitled to an instruction on self-defense where there is at least some evidence supporting the defense, even where defendant testifies that the shooting was accidental. *Id.* ¶ 61. We found that *Everette* was distinguishable because the defense theory was not that the shooting was accidental, but that defendant was not the shooter. *Id.* ¶ 62. In the absence of any evidence from the defense that he used lawful force to actually *kill* the victim, he was not entitled to a self-defense instruction. *Id.*

¶ 70    We also recognized in *Lewis* that defendant's request for a self-defense instruction was based on an attempt to combine the State's evidence that defendant shot the victim with defense evidence that he was in fear for his life at the time of the shooting. *Id.* ¶ 66. We held that where the State's evidence is that defendant was the aggressor and intentionally shot and killed the victim, such evidence does not support a claim of self-defense and may not be used in combination with defense evidence to warrant a self-defense instruction. *Id.* ¶¶ 65-66. Instead, defendant must present his *own* evidence of each of the following elements: (1) force is threatened against him; (2) he was not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed requiring *the use of the force applied*; and (6) his beliefs were objectively reasonable. *Id.* ¶ 56. We held that defendant failed to meet his burden of showing he used deadly force where the defense witness testified that he did not shoot and kill the victim, but that someone else was the shooter. *Id.* ¶ 62.

¶ 71    Similarly, in the present case, defendant improperly attempts to combine the State's evidence that he killed Ojeda with his evidence that he was engaged in an act of self-defense at the time of the killing. However, the State's evidence was that defendant chased after and intentionally killed Ojeda. Such evidence does not support a claim of self-defense where defendant was the

aggressor. The defense evidence was that during his struggle with Ojeda, defendant either never fired the weapon or that he fired it but did not hit and kill Ojeda. Such evidence also does not support a claim of self-defense where defendant did not show he used deadly force. In the absence of any evidence that defendant was entitled to a self-defense instruction, *Lockett* and *Washington* dictate that the trial court committed no abuse of discretion by denying his request for an instruction on second-degree murder based on an unreasonable belief in self-defense.

¶ 72    Next, defendant argues that we erred in *Salas* when we made the following statement regarding his closing arguments:

> "During closing arguments, defendant's theory was *not* that he shot [Ojeda] in self-defense to prevent imminent death, great bodily harm, or the commission of a forcible felony, or that [Ojeda] was struck by a bullet during that struggle, but rather, that one of the Satan Disciples accidentally shot [Ojeda] while attempting to shoot defendant." (Emphasis in the original.) *Salas*, 2011 IL App (1st) 091880, ¶ 86.

¶ 73    Defendant contends that our statement runs contrary to well-established case law holding that even where the jury is instructed on self-defense, counsel may choose to "hone in on other issues in closing argument." See *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 45.

¶ 74    Careful review of *Salas* shows that we were not criticizing defendant's closing argument or how he chose to argue his case to the jury. Rather, we were simply and accurately noting that defendant's closing argument supported our finding that he had presented no evidence showing that he admitted to killing Ojeda, which was a prerequisite to the giving of a self-defense instruction.

¶ 75    Next, defendant argues that we denied him his due process rights on direct appeal when we reviewed the propriety of the giving of the self-defense instruction, even though he had only asked

us to review the trial court's decision not to give a second-degree murder instruction. Defendant contends that on direct appeal we were "tasked" only with determining whether a second-degree murder instruction was mandatory given that a self-defense instruction *had been given*. Instead, though, defendant argues that we concocted an "imaginary situation wherein [he] did not get self-defense instructions, and then decided that, under that framework, second-degree murder instructions were not warranted either." Defendant argues that our consideration of his case "in a way different than it was actually tried" took him by surprise and denied him due process.

¶ 76    In support, defendant cites *People v. Milsap*, 189 Ill. 2d 155 (2000), and *Cole v. Arkansas*, 333 U.S. 196 (1948). In *Milsap*, defendant was charged with home invasion and robbery. *Milsap*, 189 Ill. 2d at 156. At trial, there was some evidence of two offenders, but the State never requested that the jury be instructed on accountability and neither side argued accountability to the jury. *Id.* at 159. During deliberations, the jury sent a note asking, "Is the accomplice just as guilty [as] the offender who causes an injury in a home invasion?" *Id.* Over defendant's objection, the court sent back an instruction on accountability. *Id.* at 160. The jury subsequently convicted defendant of both charges. *Id.* The appellate court affirmed. *Id.*

¶ 77    On appeal to the supreme court, defendant argued that the trial court deprived him of due process by instructing the jury on a new theory after deliberations had begun. *Id.* The State countered that the trial court appropriately responded to the jury's inquiry because an accountability instruction was justified by the evidence. *Id.* at 161. The supreme court found that the State's argument was "misplaced" because the issue was not whether the evidence supported the giving of an accountability instruction but whether the trial court violated defendant's right to due process by giving the instruction after the jury already had begun its deliberations. *Id.* The supreme court answered that question in the affirmative, holding that because the trial court

instructed the jury, after it had begun its deliberations, on a new theory of accountability that had not been argued at trial, defendant was improperly deprived of an opportunity to defend against that theory. *Id.* at 163-64. The supreme court stated:

"The State elected to charge defendant as a principal and to argue that defendant was guilty as a principal. If, as the State insists, an accountability instruction was appropriate in this case, the State should have asked for such an instruction at the proper time. It was too late for the State to change its theory of the case after the case had been sent to the jury." *Id.* at 165.

¶ 78 In *Cole*, 333 U.S. at 198, the petitioners were tried and convicted of violating section 2 of an Arkansas statute, which made it unlawful for a person to assemble with others near a labor dispute and promote or encourage others to engage in such unlawful assemblage. On appeal, the Arkansas Supreme Court affirmed the defendant's conviction on the basis of a different statutory section, which made it unlawful for any person to use force to prevent any person from engaging in any lawful vocation. *Id.* at 200. The United States Supreme Court reversed, stating: "It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made." *Id.* at 201.

¶ 79 *Milsap* and *Cole* are inapposite because, contrary to defendant's argument, we did not concoct any imaginary scenarios or consider his case in a way differently than it was actually tried. The record shows that defendant was tried and convicted of first-degree murder. During the jury instruction conference, he requested instructions on self-defense and second-degree murder based on the unreasonable belief in self-defense. The trial court gave the self-defense instruction but refused the instruction on second-degree murder. Defendant appealed the refusal to give the

second-degree murder instruction, which we specifically addressed. In so addressing the issue, we recognized that *Lockett* was the pertinent supreme court authority and we followed its express dictate to first consider whether the evidence at trial supported the giving of the self-defense instruction. *Salas*, 2011 IL App (1st) 091880, ¶ 83. We did not imagine or pretend that the self-defense instruction had not been given; rather, we considered whether there was some evidence of self-defense supporting the giving of that instruction. If some evidence of self-defense was present, then the tendered instruction on second-degree murder was also required to be given under *Lockett*; if some evidence of self-defense was lacking, the tendered second-degree murder instruction was properly denied. *Id.* We found that the evidence of self-defense was lacking and therefore affirmed the trial court's refusal to give the instruction on second-degree murder. *Id.* ¶¶ 84-87.

¶ 80    *Lockett* was decided in 1980, some 31 years prior to defendant's direct appeal here, and remains good law. Therefore, defendant should not have been surprised when, in reviewing the denial of his tendered instruction on second-degree murder, we followed *Lockett*'s holding requiring us to consider whether there was some evidence supporting the giving of the instruction on self-defense. Defendant had every opportunity on his direct appeal to argue the evidence in support of the self-defense instruction; he was not denied any due process.

¶ 81    For all the foregoing reasons, we affirm the circuit court. As we have found that defendant failed to satisfy the cause element of the cause and prejudice test, we need not address his arguments regarding prejudice.

¶ 82    Affirmed.